DA 11-0081

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 328

WESTERN TRADITION PARTNERSHIP, INC.,
a corporation registered in the State of Montana,
and CHAMPION PAINTING, INC., a Montana
corporation, MONTANA SHOOTING SPORTS
ASSOCIATION, INC., a Montana corporation,

        Plaintiffs, Appellees and
             Cross-Appellants,

    v.

ATTORNEY GENERAL of the State of Montana,
and COMMISSIONER OF THE COMMISSION
FOR POLITICAL PRACTICES,

        Defendants and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                   In and For the County of Lewis and Clark, Cause No. BDV 10-238
                   Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Steve Bullock (argued), Montana Attorney General; Anthony Johnstone,
                Solicitor, James P. Molloy, Assistant Attorney General, Helena, Montana

        For Appellees:

                Margot E. Barg (argued); Wittich Law Firm, P.C., Bozeman, Montana

        For Amici Curiae:

                Amy Poehling Eddy; Bottomly, Eddy & Sandler, Kalispell, Montana
                (for former Montana Supreme Court Justices William E. Hunt, Sr., W.
                William Leaphart, James M. Regnier, Terry N. Trieweiler and John
                Warner)

Lawrence A. Anderson, Attorney at Law, Great Falls, Montana
(for MTLA, Montana Conservation Voters, Montanans for Corporate Accountability, and Montana League of Rural Voters)

Elizabeth L. Griffing, Attorney at Law; Erin Kraft, Clinic Student, University of Montana, Missoula, Montana
(for ACLU of Montana Foundation)

Jonathan Motl; Morrison Motl & Sherwood, Helena, Montana
Jeffrey D. Clements, Clements Law Office, LLC, Concord, Massachusetts
(for Free Speech for People; American Sustainable Business Council; Novak and Novack, Inc., d/b/a Mike's Thriftway; Home Resource, Inc., and The American Independent Business Alliance)

Mark Mackin, Attorney at Law, Helena, Montana
(for Montana Public Interest Research Group and Peoples Power League)

Karl J. Englund, Karl J. Englund, P.C., Missoula, Montana;
Karl J. Sandstrom, Perkins Coie LLP, Washington, D.C.
Michael T. Liburdi, James A. Ahlers, Jerica L. Peters, Perkins Coie LLP, Phoenix, Arizona
(for Domini Social Investments LLC; Trillium Asset Management Corporation; Newground Social Investment; Interfaith Center On Corporate Responsibility; Harrington Investments, Inc.; The Sustainability Group of Loring, Wolcott & Coolidge; Calvert Asset Management Company, Inc.; The Christopher Reynolds Foundation, Inc.; and Walden Asset Management, a Division of Boston Trust & Investment Management Company)

Lee Bruner, Attorney at Law, Butte, Montana
Allen Dickerson, Attorney at Law, Alexandria, Virginia
(for Center for Competitive Politics)

_____

Argued and Submitted:  September 21, 2011

Decided:  December 30, 2011

Filed:

_____
Clerk

2

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1   The Attorney General of Montana and the Commissioner of Political Practices appeal from the District Court's Order on Cross-Motions for Summary Judgment filed October 18, 2010.  We reverse.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2   Western Tradition Partnership (WTP), Champion Painting and Montana Shooting Sports Foundation (MSSF) sued the Montana Attorney General and the Commissioner of Political Practices seeking a declaration that § 13-35-227(1), MCA, violated their freedom of speech protected by the United States and Montana Constitutions by prohibiting political expenditures by corporations on behalf of or opposing candidates for public office.  The parties filed cross-motions for summary judgment along with briefs and supporting materials.  The District Court declared the statute unconstitutional, granted summary judgment for the plaintiffs and denied summary judgment to the State defendants.  The District Court enjoined enforcement of the statute and denied the motion of Champion and MSSF for an award of attorney fees.  The State appeals the order of summary judgment in favor of the plaintiffs, and Champion and MSSF cross-appeal from the denial of their request for attorney fees.

## STANDARDS OF REVIEW

¶3   This Court reviews a district court's decision on summary judgment using the same standards as the district court under M. R. Civ. P. 56.  Where there are cross-motions for summary judgment and the district court is not called upon to resolve factual

3

issues, but only to draw conclusions of law, we review to determine whether those conclusions are correct. *Bud-Kal v. City of Kalispell*, 2009 MT 93, ¶ 15, 350 Mont. 25, 204 P.3d 738. Accordingly, a moving party is entitled to summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Town & Country Foods v. City of Bozeman*, 2009 MT 72, ¶ 12, 349 Mont. 453, 203 P.3d 1283. Statutes enjoy a presumption of constitutionality, and a decision on the constitutionality of a statute is subject to plenary review. *City of Billings v. Albert*, 2009 MT 63, ¶ 11, 349 Mont. 400, 203 P.3d 828.

## DISCUSSION

¶4    Section 13-35-227, MCA, was originally enacted as an initiative by the Montana voters in 1912. It provides:

> (1)  A corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party.
> (2)  A person, candidate or political committee may not accept or receive a corporate contribution described in subsection (1).
> (3)   This section does not prohibit the establishment or administration of a separate segregated fund to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from an individual who is a shareholder, employee or member of the corporation.
> (4)  A person who violates this section is subject to the civil penalty provisions of 13-37-128.

Section 13-37-128, MCA, provides the sanction for a violation of § 13-35-227, MCA, and allows the Commissioner of Political Practices to recover a civil penalty up to $500 or triple the amount of the unlawful expenditure. A corporation may establish a separate segregated fund called a political committee or PAC to make political expenditures "if

4

the fund consists of only voluntary contributions solicited from an individual who is a shareholder, employee, or member of the corporation. Section 13-35-227(3), MCA. Montana law requires that all political communications must include the name and address of the person or entity that paid for the communication. Section 13-35-225, MCA.

¶5   Champion Painting, Inc., is incorporated under the laws of Montana. It is a single proprietor painting and drywall business with no employees or members, and its sole shareholder is Kenneth Champion. It is the only business corporation in this action. Mr. Champion is personally active in county and state politics, supporting and opposing candidates through blogs, letters to the editor, and speeches. Champion states that he wants to speak on political issues as a spokesman for his corporation and wants to spend corporation funds to independently support or oppose candidates. He believes that doing so would be prohibited by § 13-35-227(1), MCA.

¶6   MSSA is a voluntary association of persons who support and promote firearm safety, shooting sports, education, shooting facilities and Second Amendment rights. It was incorporated in 1990 to provide liability shelter for its officers and directors. It has no employees or shareholders and its funding comes primarily from member dues and donations from other organizations. MSSA is led by its founder Gary Marbut, who is active in Montana politics on behalf of the Association. He and the MSSA have operated a political committee under Montana law for over ten years and publicize its grading and endorsements of political candidates in state and national elections. Marbut believes that the MSSA "has a political presence in Montana, and a political reputation that carries

5

some weight with the Montana public by virtue of our long history of activism in Montana." Nonetheless Marbut wants to use MSSA member dues to support or oppose candidates and believes that § 13-35-227(1), MCA, prohibits MSSA from doing so.

¶7 Western Tradition Partnership is an entity incorporated in Colorado in 2008 and registered to do business in Montana. WTP reveals no more than that about itself in this case. Evidence presented by the State in District Court and not refuted by WTP is that its purpose is to act as a conduit of funds for persons and entities including corporations who want to spend money anonymously to influence Montana elections. WTP seeks to make unlimited expenditures in Montana elections from these anonymous funding sources. WTP's operation is premised on the fact, or at least the assumption, that its independent expenditures have a determinative influence on the outcome of elections in Montana.

¶8 Upon the plaintiffs' motion for summary judgment, the District Court considered whether § 13-35-227(1), MCA, violates the First Amendment to the United States Constitution to the extent that it restricts WTP, MSSA or Champion from making independent corporate expenditures on behalf of candidates.[1] The District Court applied *Citizens United v. F.E.C.*, 130 S. Ct. 876, 175 L. Ed. 2d 753 (2010) and determined that § 13-35-227(1), MCA, impacts the corporations' political speech protected by the United States Constitution. The District Court then considered whether the State had demonstrated a compelling interest for the restriction on speech, and whether the restriction is narrowly tailored to achieve that interest. While it answered both questions

---

[1] Under Montana law corporations are allowed to make independent expenditures on ballot issues. *Montana Chamber of Commerce v. Argenbright*, 226 F.3d 1049 (9th Cir. 2000).

6

in the negative, the District Court did not conduct a detailed analysis of the compelling interest question. Instead, it concluded that "*Citizens United* is unequivocal: the government may not prohibit independent and indirect corporate expenditures on political speech." (Quoting *Minn. Chamber of Comm. v. Gaertner*, 710 F. Supp. 2d 868 (D. Minn. 2010)). The District Court specifically did not address whether § 13-35-227, MCA, violated the Montana Constitution, and further noted that the decision had "no effect on direct corporate contributions to candidates or to any existing or future disclosure laws that might be enacted." Those aspects of Montana law are therefore not at issue in this case.

¶9 We take note that Western Tradition appears to be engaged in a multi-front attack on both contribution restrictions and the transparency that accompanies campaign disclosure requirements. In addition to this case, it is currently engaged in separate litigation in the same District Court involving the Montana laws on campaign spending disclosures. *Western Tradition Partnership v. Gallik*, Cause BDV 2010-1120 (Mont. 1st Jud. Dist. Ct.).[2] In another action filed in United States District Court in September, 2011, WTP, under its new name of American Tradition Partnership, and with others, challenges the constitutionality of most of the limits and disclosure requirements contained in § 13-37-216, MCA. *Lair, et al., v. Gallik, et al.*, United States District Court

---

[2] In a decision in October, 2010, the Montana Commissioner of Political Practices found that WTP had created a sham organization through which to channel campaign funds, and that its arguments to the contrary were deceptive. The Commissioner further concluded that WTP's failure to register as a political committee and to disclose the true source and disposition of the funds it raised "frustrates the purpose of Montana's Campaign Finance and Practices Act [and] raises the specter of corruption of the electoral process. . . ."

for the District of Montana, Billings Division. Ironically, perhaps, WTP argued in the District Court and in its oral presentation to this Court on appeal that their compliance with these same disclosure laws that it now seeks to invalidate should remedy any concerns regarding the potential corrupting influence of its unlimited corporate expenditures.

¶10    The District Court erroneously construed and applied the *Citizens United* case. That case considered the constitutionality of Federal statutes and regulations that prohibited corporations from "electioneering" (making a communication that refers to a clearly identified candidate for Federal office) within 30 days of a primary election or 60 days of a general election.

¶11    *Citizens United* was a case decided upon its facts, and involved "unique and complex" rules that affected 71 distinct entities and included separate rules for 33 different types of speech in Federal elections. Since 1975, the Federal Election Commission adopted 568 pages of regulations, 1,278 pages of explanatory materials, and 1,771 advisory opinions to implement and enforce the Federal law. The FEC adopted a two-part, 11-factor test in response to the holding in a single Supreme Court decision. If parties want to avoid litigation and possible penalties they must either refrain from political speech or seek an advisory opinion. All of this, the Supreme Court found, allows the FEC to "select what political speech is safe for public consumption by applying ambiguous tests." *Citizens United*, 130 S. Ct. at 895-96. The Court determined that the  law was "an outright ban, backed by criminal sanctions." *Citizens United*, 130 S. Ct. at 897.

8

¶12     A premise of *Citizens United* was that First Amendment protections extend to corporations. *Citizens United*, 130 S. Ct. at 899.  The Court additionally determined that the option for a corporation to spend through a separate PAC was not a sufficient alternative because of the burdensome, extensive, and expensive Federal regulations that applied.   The Federal law allowed corporations to form a separate segregated fund (sometimes called a political action committee or PAC) as long as the funds were limited to donations from stockholders or, in the case of unions, its members.  The Court found the regulations governing the organization of PACs to be "onerous" restrictions that might not allow a corporation to establish a PAC in time to make its views known in a current campaign.   *Citizens United*, 130 S. Ct. at 898.  Therefore, because the Federal laws and regulations severely restricted speech, their constitutionality could be maintained only upon a showing that they further a compelling governmental  interest and are narrowly tailored to achieve that interest. *Citizens United*, 130 S. Ct. at 898.

¶13     The Court found that the Government did not claim that corporate expenditures had actually corrupted the political process and concluded that "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption."  *Citizens United*, 130 S. Ct. at 909.  However, if elected officials do succumb to improper influences from independent expenditures, "then surely there is cause for concern." *Citizens United*, 130 S. Ct. at 911.

¶14     The Court determined that the government had not provided a compelling interest to justify the speech restrictions at issue.  The Court considered and rejected arguments that preventing the distorting effect of large expenditures; preventing corruption or the

appearance of corruption; or protection of dissenting shareholders were sufficient interests to support the Federal restrictions. Therefore, finding no compelling interest for the Federal restrictions on corporate political speech through independent expenditures, the Court found an impermissible contravention of the First Amendment. *Citizens United*, 130 S. Ct. at 911.

¶15   While *Citizens United* was decided under its facts or lack of facts,[3] it applied the long-standing rule that restrictions upon speech are not per se unlawful, but rather may be upheld if the government demonstrates a sufficiently strong interest. *Citizens United*, 130 S. Ct. at 898; *Federal Election Comm. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 251-52, 107 S. Ct. 616, 624 (1986); *Bluman v. Federal Election Commission*, 2011 U.S. Dist. LEXIS 86971 (D. D.C. 2011) (upholding Federal ban against campaign contributions by foreign citizens). The Supreme Court in *Citizens United* applied the highest level of scrutiny to the restrictions at issue there, requiring the government to demonstrate a compelling interest, although the level of evidence needed to satisfy heightened scrutiny will vary with the "novelty and plausibility of the justification raised." *Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 391, 120 S. Ct. 897, 906 (2000). Therefore, the factual record before a court is critical to determining the validity of a governmental provision restricting speech. The Dissents assert that *Citizens United* holds unequivocally that no sufficient government interest justifies limits on political speech. We disagree. The Supreme Court held that laws that burden political speech are subject

---

[3] The Court noted, for example, the "scant evidence" of the effects of independent expenditures. *Citizens United*, 130 S. Ct. at 910.

10

to strict scrutiny, which requires the government to prove that the law furthers a compelling state interest and is narrowly tailored to that interest. The Court, citing *Wisconsin Right to Life v. FEC*, 551 U.S. 449, 464, 127 S. Ct. 2652, 2663-64 (2007), clearly endorsed an analysis of restrictions on speech, placing the burden upon the government to establish a compelling interest. *Citizens United*, 130 S. Ct. at 898. Here the government met that burden.

¶16 In this case both sides moved the District Court for summary judgment. The WTP parties conducted no discovery in the case and presented two brief affidavits, one from the MSSF and one from Mr. Champion in support of summary judgment. The State presented a more extensive record consisting of the deposition transcripts of both Mr. Champion and Mr. Marbut of the MSSF, along with seven affidavits and attached exhibits. The plaintiffs did not contest any of this evidence. Nonetheless, the District Court failed to give adequate consideration to the record in determining whether the State had demonstrated a compelling interest for the restrictions imposed by § 13-35-227(1), MCA. We do so now because, unlike *Citizens United*, this case concerns Montana law, Montana elections and it arises from Montana history.

¶17 First, the depositions of Marbut (on behalf of MSSF) and Champion demonstrate that both have been very active politically in Montana on a range of issues that concern them. Neither could demonstrate any material way in which Montana law hindered or censored their political activity or speech. Mr. Marbut, on behalf of MSSF, has been an active fixture in Montana politics and in the legislative process for many years. He stated that he believed that while Montana law allowed MSSF to obtain and spend donations

11

from other organizations on political activities, it did not allow MSSF to use dues paid by its members for the same purposes. No such distinction appears in Montana law, and the affidavit of the Commissioner of Political Practices affirms his construction of Montana law that it places no such restriction on MSSF. MSSF, therefore, failed to demonstrate that its speech was impaired by the statute.

¶18    Similarly, Mr. Champion described his many political activities both on a local and state level. He affirmed that he regularly speaks, blogs, and meets with others, and has run for public office. His complaint was that he believed that Montana law prohibits him from telling his audiences and readers that his company, Champion Painting, also supports his views. Mr. Champion believes that a candidate endorsement by "Champion Painting, Inc." would be more persuasive than his personal endorsement, and that if his business spends money on political events he will enjoy "tax benefits." However, in Champion's case he is the sole shareholder and derives his livelihood from the money he pays himself from the corporation. While the statute forbids the expenditure of Champion Painting's corporate funds to support or oppose candidates, the burden upon Kenneth Champion, as a sole shareholder, to establish a political committee to advocate for his corporation's interests and expend funds that he will decide to contribute, are particularly minimal. We conclude, under these facts, Champion's political speech was similarly not materially impacted by the statute.

¶19    WTP, as noted, has been terse in its explanations of its organization, funding, activities, and intent. It claims to be a foreign corporation but it is not a business corporation. Its purpose, according to un-rebutted evidence submitted to the District

12

Court by the State, is to solicit and anonymously spend the funds of other corporations, individuals and entities to influence the outcome of Montana elections. In a promotional presentation directed to potential donors, WTP represented:

> There's no limit to how much you can give. As you know, Montana has very strict limits on contributions to candidates, but there is no limit to how much you can give to this program. You can give whatever you're comfortable with and make as big of an impact as you wish.
> Finally, we're not required to report the name or the amount of any contribution that we receive. So, if you decide to support this program, no politician, no bureaucrat, and no radical environmentalist will ever know you helped make this program possible. *The only thing we plan on reporting is our success to contributors like you who can see the benefits of a program like this. You can just sit back on election night and see what a difference you've made*.

Western Tradition Partnership, *2010 Election Year Program Executive Briefing.* (Emphasis added.)

¶20 Organizations like WTP that act as conduits for anonymous spending by others represent a threat to the "political marketplace." *Mass. Citizens for Life, Inc.*, 479 U.S. at 264, 107 S. Ct. at 631. Echoing that theme, the State presented evidence that WTP has operated in disregard for and without complying with Montana law, unlike MSSF and Champion. Because WTP has not disclosed its operation, it is difficult to determine how it might be impacted by § 13-35-227(1), MCA, but given the evidence presented below we will assume there is a direct impact.

¶21 Second, a material factual distinction between the present case and *Citizens United* is the extent of the regulatory burden imposed by the challenged law. As noted above, the Court in *Citizens United* emphasized the length, complexity and ambiguity of the

13

Federal restrictions, including the power of the FEC to determine what speech is "safe for public consumption," and the difficulty of establishing a PAC as an alternative to direct corporate spending. In contrast, under Montana law a political committee can be formed and maintained by filing simple and straight-forward forms or reports. (*See e.g.* §§ 13-37-201 and -210; 13-35-402, MCA.) Mr. Marbut in his deposition described that MSSF has established its own political committees and used them to actively participate in the Montana political process over a period of years. The evidence submitted by the State in the District Court similarly demonstrates that corporations, through their political committees organized under Montana law, are and have been a substantial presence and active participants in Montana politics. The many lobbyists and political committees who participate in each session of the Montana Legislature bear witness. Under the undisputed facts here, the political committee is an easily implemented and effective alternative to direct corporate spending for engaging in political speech. This alternative is available to any corporation in Montana, and to MSSF and Champion, as well as WTP should they choose to comply with existing Montana law. In the case of MSSF the evidence shows that it has in fact effectively used the political committee form for years and there is no showing that it could not continue to do so.

¶22 Third, the Montana law at issue in this case cannot be understood outside the context of the time and place it was enacted, during the early twentieth century. (Montana became a state in 1889.) Those tumultuous years were marked by rough contests for political and economic domination primarily in the mining center of Butte, between mining and industrial enterprises controlled by foreign trusts or corporations.

14

These disputes had profound long-term impacts on the entire State, including issues regarding the judiciary, the location of the state capitol, the procedure for election of U.S. Senators, and the ownership and control of virtually all media outlets in the State.

¶23    Examples of well-financed corruption abound.  In the fight over mineral rights between entrepreneur F. Augustus Heinze and the Anaconda Company, then controlled by Standard Oil, Heinze managed to control the two State judges in Butte, who routinely decided cases in his favor.  K. Ross Toole, *Montana, An Uncommon Land*, 196-99 (Univ. of Okla. Press 1959) the Butte judges denied being bribed, but one of them admitted that Anaconda representatives had offered him $250,000 cash to sign an affidavit that Heinze had bribed him. Toole, *Montana, An Uncommon Land*, 204.

¶24    In response to the legal conflicts with Heinze, in 1903 Anaconda/Standard closed down all its industrial and mining operations (but not the many newspapers it controlled), throwing 4/5 of the labor force of Montana out of work.  Toole, *Montana, An Uncommon Land*, 206.  Its price for sending its employees back to work was that the Governor call a special session of the Legislature to enact a measure that would allow Anaconda to avoid having to litigate in front of the Butte judges.  The Governor and Legislature capitulated and the statute survives.  *See e.g. Patrick v. State*, 2011 MT 169, ¶¶ 17-23, 361 Mont. 204, 257 P.3d 365.

¶25    W. A. Clark, who had amassed a fortune from the industrial operations in Butte, set his sights on the United States Senate.  In 1899, in the wake of a large number of suddenly affluent members, the Montana Legislature elected Clark to the U. S. Senate. Clark admitted to spending $272,000 in the effort and the estimated expense was over

15

$400,000. Complaints of Clark's bribery of the Montana Legislature led to an investigation by the U. S. Senate in 1900. The Senate investigating committee concluded that Clark had won his seat through bribery and unseated him. The Senate committee "expressed horror at the amount of money which had been poured into politics in Montana elections . . . and expressed its concern with respect to the general aura of corruption in Montana." Toole, *Montana, An Uncommon Land*, 186-94.

¶26 In a demonstration of extraordinary boldness, Clark returned to Montana, caused the Governor to leave the state on a ruse and, with assistance of the supportive Lt. Governor, won appointment to the very U. S. Senate seat that had just been denied him. Toole, *Montana, An Uncommon Land*, 192-93. When the Senate threatened to investigate and unseat Clark a second time, he resigned. Clark eventually won his Senate seat after spending enough on political campaigns to seat a Montana Legislature favorable to his candidacy.

¶27 After the Anaconda Company cleared itself of opposition from Heinze and others, it controlled 90% of the press in the state and a majority of the legislature. C. B. Glasscock, *The War of the Copper Kings*, 290 (Grosset & Dunlap, N.Y. 1935). By 1915 the company, after having acquired all of Clark's holdings as well as many others, "clearly dominated the Montana economy and political order . . . [and] local folks now found themselves locked in the grip of a corporation controlled from Wall Street and insensitive to their concerns." Michael Malone and Richard Roeder, *Montana, a History of Two Centuries*, 176 (Univ. of Wash. Press, Seattle 1976). Even at that time it was evident that industrial corporations controlled the state "thus converting the state

government into a political instrument for the furthering and accomplishment of legislation and the execution of laws favorable to the absentee stockholders of the large corporations and inimical to the economic interests of the wage earning and farming classes who constitute by far the larger percentage of the population in Montana." Helen Fisk Sanders, *History of Montana*, Vol. 1, 429-30 (Lewis Pub. Co. 1913).

¶28    In 1900 Clark himself testified in the United States Senate that "[m]any people have become so indifferent to voting" in Montana as a result of the "large sums of money that have been expended in the state. . . . " Toole, *Montana, An Uncommon Land*, 184-85. This naked corporate manipulation of the very government (Governor and Legislature) of the State ultimately resulted in populist reforms that are still part of Montana law. In 1906 the people voted to amend the state Constitution to allow for voter initiatives. Not long thereafter, in 1906 this new initiative power was used to enact reforms including primary elections to choose political candidates; the direct election of United States Senators; and the Corrupt Practices Act, part of which survives as § 13-35-227, MCA, at issue in this case.

¶29    The State of Montana was still contending with corporate domination even in the mid-20[th] century. For example, the Anaconda Company maintained controlling ownership of all but one of Montana's major newspapers until 1959. Writing in 1959, historian K. Ross Toole so noted and described the state:

> Today the influence of the Anaconda Company in the state legislature is unspectacular but very great. It has been a long time since the company showed the mailed fist. But no informed person denies its influence or the fact that the basic use to which it is put is to maintain the status quo—to

17

keep taxes down, not to rock the boat. Few of the company personnel either in Butte or in New York remember F. Augustus Heinze, or even for that matter, [U. S. Senator] Joseph M. Dixon, but it would be foolish for anyone to deny that the pervasive influence of the Anaconda Company in Montana politics is part and parcel of the Montana heritage.

Toole, *Montana, An Uncommon Land*, 244. A study of Montana in the early 1970s concluded that corporate influence of the Anaconda Company had been "replaced by a corporate power structure, with interlocked directorates, the same law firms and common business interests" among the Anaconda Company, Montana Power Company, Burlington Northern Railway and the First Bank System. Malone and Roeder, *Montana, a History of Two Centuries*, 290. History professor Dr. Harry Fritz, in his affidavit presented in the District Court, affirmed that the "dangers of corporate influence remain in Montana" because the resources upon which its economy depends in turn depend upon distant markets. He affirmed: "What was true a century ago is as true today: distant corporate interests mean that corporate dominated campaigns will only work 'in the essential interest of outsiders with local interests a very secondary consideration.'" While specific corporate interests come and go in Montana, they are always present. Montana's mineral wealth, for example, has historically been exported from the State, and that is still true today. *Commonwealth Edison Co. v. State of Montana*, 189 Mont. 191, 196, 615 P.2d 847, 850 (1980), *aff'd*, 453 U.S. 609, 101 S. Ct. 2946. The corporate power that can be exerted with unlimited political spending is still a vital interest to the people of Montana.

18

¶30 Furthermore, in the evidence presented below the State demonstrated aptly how even small expenditures of money can impact Montana elections. The State submitted affidavits from two respected and experienced politicians and public servants. Bob Brown, a Republican, served in the Montana House of Representative, in the Montana Senate, as the Montana Secretary of State and as an unsuccessful candidate for Governor. He retired in 2010 as a Senior Fellow at the Center for the Rocky Mountain West and the Mansfield Center, at the University of Montana. Mike Cooney, a Democrat, served in the Montana House of Representatives, in the Montana Senate, as the Montana Secretary of State, and also as an unsuccessful candidate for Governor. Both affirmed that Montana, with its small population, enjoys political campaigns marked by person-to-person contact and a low cost of advertising compared to other states. They affirmed that allowing unlimited independent expenditures of corporate money into the Montana political process would drastically change campaigning by shifting the emphasis to raising funds.

¶31 Cooney, for example, ran his first state legislative campaign for $750 as a "grassroots" effort that he believed could have been derailed by an opposing expenditure of even a couple of thousand dollars. Brown affirmed that Montana politics are more susceptible to corruption than Federal campaigns, and that infusions of large amounts of corporate independent expenditure on just media coverage "could accomplish the same type of corruption of Montana politics as that which led to the enactment of" § 13-35-227, MCA. Cooney recounted his experience from his most recent campaign when he found that voters were concerned that they "didn't really count" in the political process unless they can make a material financial contribution, and that special interests therefore

19

hold sway.  This is much the same sentiment described by W. A. Clark to the United States Senate committee over a century ago, quoted above.

¶32   The State also presented the affidavit of Edwin Bender of the National Institute on Money in State Politics.  He confirmed that under Montana law corporations can now make unlimited contributions (in amount) for independent expenditures from their corporate PACs to support or oppose candidates, directly to ballot measure committees, and to support or oppose ballot measures, and can make unlimited expenditures on lobbyists.  Corporations can make contributions with the same limits as all donors from their PACs to candidates and to party committees.  Bender also affirmed the low cost of political races in Montana, in comparison to other states,[4] with all legislative and statewide candidates for office raising a total of around $7 million in 2008.  In that year the average candidate for the Montana House raised $7,475 and the average candidate for the Montana Senate raised $13,299.  This makes it possible for direct political spending by corporations to significantly affect the outcome of elections.

¶33   Bender also affirmed that studies of election spending in the United States show that the percentage of campaign contributions from individual voters drops sharply from 48% in states with restrictions on corporate spending to 23% in states without.  Evidence presented in the District Court showed that in recent years in Montana, corporate independent spending on ballot issues has far exceeded spending from other sources.  He provided an extensive 2010 joint study by the Hofstra University School of Law, the

---

[4] Montana is the fourth largest state in size, covering over 145,000 square miles, and has a population less than one million people.

20

Brandeis Center at the NYU School of Law and the National Institute on Money in State Politics that concluded that polling shows that 3 of 4 Americans believe that campaign contributions affect judicial decisions in states where judges are elected. *The New Politics of Judicial Elections 2000-2009*, Charles Hall ed., Justice at Stake Campaign, 2010.

¶34 Laws that impact speech in some way must be evaluated by using the proper level of scrutiny. This is determined by the type of speech that the law affects and the type of burden that the law imposes. *Davis v. Fed. Election Comm.*, 554 U.S. 724, 737, 128 S. Ct. 2759, 2770 (2008). Laws that place severe burdens on fully protected speech are subject to strict scrutiny, *Arizona Free Enterprise Club v. Bennett*, __ U.S. __, 131 S. Ct. 2806, 2816-17 (2011), while laws that place only a minimal burden or that apply to speech that is not fully protected receive intermediate scrutiny. *Davis*, 554 U.S. at 737, 128 S. Ct. at 2771.

¶35 Montana law has long incorporated a requirement of a compelling state interest in evaluating cases involving claims that governmental action infringes upon constitutional rights. The Montana Constitution, Art. 2 § 10, expressly incorporates the standard for evaluating issues affecting the right of individual privacy. *Montana Hum. Rights Div. v. City of Billings*, 199 Mont. 434, 439-40, 649 P.2d 1283, 1286 (1982); *St. James Comm. Hosp. v. District Court*, 2003 MT 261, ¶ 4, 317 Mont. 419, 77 P.3d 534. Under Montana law the government must demonstrate a compelling interest when it intrudes on a fundamental right, and determination of a compelling interest is a question of law. *State v. Pastos*, 269 Mont. 43, 47, 887 P.2d 199, 202 (1994).

21

¶36 Based upon the background of § 13-35-227(1), MCA, the State of Montana, or more accurately its voters, clearly had a compelling interest to enact the challenged statute in 1912. At that time the State of Montana and its government were operating under a mere shell of legal authority, and the real social and political power was wielded by powerful corporate managers to further their own business interests. The voters had more than enough of the corrupt practices and heavy-handed influence asserted by the special interests controlling Montana's political institutions. Bribery of public officials and unlimited campaign spending by the mining interests were commonplace and well known to the public. Referring to W. A. Clark, but describing the general state of affairs in Montana, Mark Twain wrote in 1907 that Clark "is said to have bought legislatures and judges as other men buy food and raiment. By his example he has so excused and so sweetened corruption that in Montana it no longer has an offensive smell." Mark Twain, *Mark Twain in Eruption*, 72 (Harper & Bros. 1940).

¶37 The question then, is when in the last 99 years did Montana lose the power or interest sufficient to support the statute, if it ever did. If the statute has worked to preserve a degree of political and social autonomy is the State required to throw away its protections because the shadowy backers of WTP seek to promote their interests? Does a state have to repeal or invalidate its murder prohibition if the homicide rate declines? We think not. Issues of corporate influence, sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs make Montana especially vulnerable to continued efforts of corporate control to the detriment of democracy and the republican form of government. Clearly

22

Montana has unique and compelling interests to protect through preservation of this statute.

¶38    While Montana has a clear interest in preserving the integrity of its electoral process, it also has an interest in encouraging the full participation of the Montana electorate. The unrefuted evidence submitted by the State in the District Court through the affidavit of Edwin Bender demonstrates that individual voter contributions are diminished from 48% of the total raised by candidates in states where a corporate spending ban has been in place to 23% of the total raised by candidates in states that permit unlimited corporate spending. The point is illustrative of Montana, a state where citizens generally support candidates with modest campaign donations. In the case of ballot issues, where corporations may make unlimited donations, the characteristics of donors are markedly different from those who give to candidates. In 2004, for example, 97 institutional donors gave 95% of the total money raised in ballot initiative campaigns, while 760 individual donors accounted for the remaining 5%. Similarly, in 2008, 34 institutional donors gave 95% of the total money donated to ballot campaigns. Moreover, unlimited corporate money would irrevocably change the dynamic of local Montana political office races, which have historically been characterized by the low-dollar, broad-based campaigns run by Montana candidates. At present, the individual contribution limit for Montana House, Senate and District Court races is $160, and for Supreme Court elections it is $310. Section 13-37-216, MCA, as adjusted as provided in (4). With the infusion of unlimited corporate money in support of or opposition to a targeted candidate, the average citizen candidate would be unable to compete against the corporate-

23

sponsored candidate, and Montana citizens, who for over 100 years have made their modest election contributions meaningfully count would be effectively shut out of the process.

¶39 Montana also has a compelling interest in protecting and preserving its system of elected judges. In this State, the people elect the Justices of the Supreme Court, the Judges of the District Courts, and most lower court judges as well. Mont. Const. art. VII, § 8; § 3-2-101, MCA; and § 3-5-201, MCA. Judicial elections are nonpartisan. Section 13-14-111, MCA. When only an incumbent is running for a judicial seat, the voters can approve or reject the candidate. Mont. Const. art. VII, § 8 (e).

¶40 The people of the State of Montana have a continuing and compelling interest in, and a constitutional right to, an independent, fair and impartial judiciary. The State has a concomitant interest in preserving the appearance of judicial propriety and independence so as to maintain the public's trust and confidence. In the present case, the free speech rights of the corporations are no more important than the due process rights of litigants in Montana courts to a fair and independent judiciary, and both are constitutionally protected. The Bill of Rights does not assign priorities as among the rights it guarantees. *Neb. Press Assoc. v. Stuart*, 427 U.S. 539, 561, 96 S. Ct. 2791, 2803 (1976).

¶41 Clearly the impact of unlimited corporate donations creates a dominating impact on the political process and inevitably minimizes the impact of individual citizens. As to candidates for political office, § 13-35-227(1), MCA, is designed to further the compelling interest of the people of Montana in strong voter participation in the process.

24

While corporations have first amendment rights in political speech, they do not have the vote.

¶42 The importance of and compelling interest in an independent judiciary is reflected as a matter of policy in Montana's Code of Judicial Conduct.

> An independent, fair and impartial judiciary is indispensable to our system of justice. The United States legal system is based upon the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society.

Mont. Code of Judicial Conduct, *Preamble*. Montana expects its judges to act to promote "public confidence in the independence, integrity, and impartiality of the judiciary" and to "avoid impropriety and the appearance of impropriety." Mont. Code of Judicial Conduct, Rule 1.2. Because it is the duty of a judge to make decisions based upon the facts and law of every case, a judge must "to the greatest extent possible, be free and appear to be free from political influence and political pressure." Mont. Code of Judicial Conduct, Rule 4.2, *Comment* [1]. "Public confidence in the independence and impartiality of the judiciary is eroded if judges or judicial candidates are perceived to be subject to political influence." Mont. Code of Judicial Conduct, Rule 4.2, *Comment* [3].

¶43 The United States Supreme Court has affirmed the importance of judicial integrity and in maintaining public respect for the judiciary.

> "Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. *Judicial integrity is, in consequence, a state interest of the highest order*." [Emphasis added.]

25

*Caperton v. A. T. Massey Coal Co., Inc.*, 558 U.S. 868, ___, 129 S. Ct. 2252, 2266-67 (2009) (quoting *Republican Party of Minn. v. White*, 536 U.S. 765, 122 S. Ct. 2528 (2002)). The Court also recognizes the importance of state codes of judicial conduct, which "serve to maintain the integrity of the judiciary and the rule of law." *Caperton*, 558 U.S. at ___, 129 S. Ct. at 2266. States have a "compelling interest" in preventing judges from activities that "would undermine actual impartiality, as well as its appearance." *Bauer v. Shepard*, 620 F.3d 704, 711 (7th Cir. 2010) (upholding limits on judges acting in posts of political leadership and delivering political speeches). "The state certainly has a compelling state interest in the public's trust and confidence in the integrity of our judicial system." *Simes v. Ark. Judicial Discipline and Disability Comm.*, 247 S.W.3d 876, 882 (Ark. 2007).

¶44 Montana judicial elections would be particularly vulnerable to large levels of independent spending, both in terms of fairness and in terms of the public perception of impartiality. Litigants appearing before a judge elected after a large expenditure of corporate funds could legitimately question whether their due process rights were adversely impacted. In the 2008 contested election for Chief Justice of the Montana Supreme Court, evidence presented by the State in the District Court indicated that the total expenditure for media advertising was about $60,000. It is clear that an entity like Massey Coal, willing to spend even hundreds of thousands of dollars, much less millions, on a Montana judicial election could effectively drown out all other voices. The historic

26

Heinze-Anaconda conflict noted above illustrates the obvious negative and corrupting effects of a "bought" judiciary.

¶45 Sandra Day O'Connor recently wrote in her introduction to *The New Politics of Judicial Elections* that the "crisis of confidence in the impartiality of the judiciary is real and growing." The Executive Summary in that same report noted a study of the nation's ten most costly judicial elections shows the extraordinary spending power of "super spender groups," which are mostly corporate funded. Montana is not immune from such influence and has a compelling interest in precluding corporate expenditures on judicial elections based upon its interest in insuring judicial impartiality and integrity, its interest in preserving public confidence in the judiciary and its interest in protecting the due process rights of litigants.[5]

¶46 As discussed above, the statute has no or minimal impact on MSSF and Champion. Because of this minimal impact, the State is not required to demonstrate a compelling interest to support § 13-35-227(1), MCA. It is required only to demonstrate the less exacting sufficiently important interest. For the same reasons discussed above with regard to the compelling state interest, the statute is clearly supported by important governmental interests. Therefore, as to MSSF and Champion, it passes constitutional muster as well.

---

[5] The State has additionally argued that it has a compelling interest in protecting the rights of dissenting shareholders who disagree with the political stance of corporate spending. We do not reach that issue because it has not been presented in the factual framework of this case.

¶47 Finally, § 13-35-227(1), MCA, is narrowly tailored to meet its objectives. The statute only minimally affects entitles like MSSF and Champion. Even if it applies directly to WTP, WTP can still speak through its own political committee/PAC as hundreds of organizations in Montana do on an ongoing basis. Unlike the Federal law PACs considered in *Citizens United*, under Montana law political committees are easy to establish and easy to use to make independent expenditures for political speech. As the Bender affidavit submitted by the State in District Court confirms, corporate PACs can make unlimited independent expenditures on behalf of candidates. The difference then is that under Montana law the PAC has to comply with Montana's disclosure and reporting laws. And as noted earlier, corporations are allowed to contribute to ballot issues in Montana, which is a significant distinction because ballot issues often have a direct impact on corporate business activities within Montana but present less danger of corruptive influences that have concerned Montana voters since 1912. The statute only addresses contributions regarding candidates for state political office.

**CONCLUSION**

¶48 *Citizens United* does not compel a conclusion that Montana's law prohibiting independent political expenditures by a corporation related to a candidate is unconstitutional. Rather, applying the principles enunciated in *Citizens United*, it is clear that Montana has a compelling interest to impose the challenged rationally-tailored statutory restrictions. We reverse the District Court and enter summary judgment in favor of the Montana Attorney General and the Commissioner of Political Practices and

28

against WTP, MSSF and Champion. Consequently, the cross-appeal on the issue of attorney fees is moot.

/S/ MIKE McGRATH

We concur:

/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Beth Baker, dissenting.

¶49 I agree with Justice Nelson that we are constrained by *Citizens United* to declare § 13-35-227(1), MCA, unconstitutional to the extent it prohibits independent corporate expenditures for political speech. In my view, the State of Montana made no more compelling a case than that painstakingly presented in the 90-page dissenting opinion of Justice Stevens and emphatically rejected by the majority in *Citizens United.* Though I believe *Citizens United* requires us to affirm the District Court, we must in any event anticipate the consequences should the Court's holding today be reversed. Rather than inventing distinctions in what I fear will be a vain attempt to rescue Montana's Corrupt Practices Act, I would construe the statute in a manner to preserve what remains of its constitutionality and to further the legislature's underlying intent to prevent corruption.

¶50 *Citizens United* holds unequivocally that "[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations." 130 S. Ct.

29

at 913.  Just as unequivocally, however, it allows the government to impose disclaimer and disclosure requirements on political speech because, while such requirements "may burden the ability to speak, . . . they 'impose no ceiling on campaign-related activities,' . . . and 'do not prevent anyone from speaking[.]'"  130 S. Ct. at 914 (citations omitted). Plaintiffs' counsel acknowledged during oral argument that disclosure requirements are the means by which to address the State's compelling interest in preserving the integrity of the election process.  And the Amicus Curiae Brief from the Center for Competitive Politics described disclosure mandates as among the "constitutional tools" available to states in the wake of *Citizens United*.  In light of *Citizens United*'s clear directive that the State cannot prohibit corporate expenditures, our review and construction of the challenged statute should focus on preserving disclosure requirements as applied to such expenditures in order to protect the overriding interest in preventing corruption.

¶51     This Court attempts to construe statutes in a manner that avoids unconstitutional interpretation.  *Oberson v. USDA*, 2007 MT 293, ¶ 14, 339 Mont. 519, 171 P.3d 715.  If a law contains both constitutional and unconstitutional provisions, the Court first will examine the legislation to determine if there is a severability clause.  *PPL Mont., LLC v. State*, 2010 MT 64, ¶ 131, 355 Mont. 402, 229 P.3d 421 (citing *Finke v. State*, 2003 MT 48, ¶ 25, 314 Mont. 314, 65 P.3d 576).  In the absence of such a clause, the Court considers "whether the integrity of [the law] relies upon the unconstitutional provision or whether the inclusion of [the] provisions acted as inducement to its enactment."  *Finke*, ¶ 26.  If the unconstitutional provisions are stricken, the law must be complete in itself and still capable of execution in accord with legislative intent.  *Finke,* ¶ 26.  Though "the

30

presumption is against the mutilation of a statute," *Sheehy v. Pub. Emp. Retirement Div.*, 262 Mont. 129, 142, 864 P.2d 762, 770 (1993), if the offending provisions may be removed without frustrating the purpose or disrupting the integrity of the law, the Court will strike only those provisions of the statute that are unconstitutional. *Mont. Auto. Ass'n v. Greely*, 193 Mont. 378, 380-81, 632 P.2d 300, 302 (1981).

¶52 Plaintiffs seek a ruling invalidating subsection (1) of § 13-35-227, MCA. That subsection prohibits a corporation from making "a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party." Subsection (2) of the statute, not challenged here, prohibits a person, candidate, or political committee from accepting or receiving a corporate contribution. Subsection (3) of the same statute allows "the establishment or administration of a separate, segregated fund to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from an individual who is a shareholder, employee, or member of the corporation."

¶53 Section 13-35-227(3), MCA, when read in the context of Montana's overall campaign finance scheme, expresses the legislature's intent to provide citizens and shareholders with information about sources of funds used in support of candidates and ballot issues. Under *Citizens United*, the State clearly may not require corporate independent expenditures to come from a fund consisting only of "voluntary contributions" as the language of § 13-35-227(3), MCA, now provides. Subsection (1) of the statute still could be preserved by allowing corporate expenditures under that subsection to be made from a "separate segregated fund" as prescribed by subsection (3),

31

without applying the now-invalid requirement that "the funds consist[] only of voluntary contributions."

¶54 I would therefore hold that the Commissioner constitutionally may extend Montana's disclosure and reporting laws to independent expenditures by corporate entities made on behalf of candidates or political committees, just as the Commissioner has done for corporate expenditures on ballot issue campaigns. Without such a holding, and given that the Montana Legislature will not meet in general session prior to the next election, Montana voters may be left in the dark if § 13-35-227(1), MCA, is invalidated by the nation's highest court.

¶55 Applying § 13-35-227(3), MCA, in a constitutionally-permitted fashion to expenditures from a corporate treasury will further the government's interest in disclosure requirements and will not disrupt the statute's integrity. As noted by the Majority, only part of the original Corrupt Practices Act survives in § 13-35-227, MCA. Opinion, ¶ 28. The statute has been amended numerous times in its 100-year history. Subsection (3) was added in 1979. 1979 Mont. Laws ch. 404, 1011. The statute's most recent modification was in 2003, after federal courts invalidated the law's prohibition against corporate contributions and expenditures in ballot issue campaigns. *Mont. Chamber of Com. v. Argenbright*, 28 F. Supp. 2d 593, 600-01 (D. Mont. 1998), *aff'd*, 226 F.3d 1049, 1052 (9th Cir. 2000). Although neither the original Act nor most of its amendments have included a severability clause, applying the statute in the fashion I suggest is consistent with the *Finke* analysis.

32

¶56 Through the years, while legislative history is scant, the legislature's palpable intent was to prevent corruption in Montana elections. Opinion, ¶¶ 22-28. Prohibition of corporate contributions has been one means to achieve that goal; disclosure has been another. State Senator Miles Romney, sponsor of the 1975 amendment that first introduced the ban on corporate spending in ballot issue campaigns, commented in part that "everyone should know who is giving how much" and statements of contributions would facilitate that knowledge. Mont. H. Jud. Comm., *Hearing on SB 97*, at 5 (Mar. 7, 1975). Through its various iterations, inducement for the legislation has been the legislature's desire to prevent corruption in elections. Absent constitutional authority for an outright ban on corporate spending, prohibiting application of the "voluntary contributions" clause to expenditures made under subsection (1) will further, not frustrate, the accountability that fosters prevention of corruption.

¶57 Construing the statute to preserve its requirement for a separate segregated fund from which corporate expenditures are made will facilitate disclosure under requirements promulgated by the Montana Commissioner of Political Practices. The Affidavit of Dennis Unsworth, submitted by the State before the District Court, described the disclosure process in place at the present time for corporate spending on ballot issue measures. Unsworth stated that independent expenditures from a corporate treasury to support or oppose a ballot measure must be reported on the Commissioner of Political Practices' Form C-4. The C-4 form is for "incidental political committees," which are defined in the Commissioner's rules as "a political committee that is not specifically organized or maintained for the primary purpose of influencing elections but that may

33

incidentally become a political committee by making a contribution or expenditure to support or oppose a candidate and/or issue." Admin. R. M. 44.10.327(2)(c). The only other types of political committees are "principal campaign committees" and "independent committees," both of which are committees specifically organized to support or oppose various candidates or issues. An independent committee includes a Political Action Committee. Admin. R. M. 44.10.327(2)(b)(i). Thus, the Commissioner's rules treat corporate treasury expenditures as expenditures by "incidental committees" because the entities do not exist for the specific purpose of supporting or opposing candidates, ballot issues, or both.

¶58 The integrity and purpose of the law can be salvaged by permitting the Commissioner to apply "incidental committee" status to a separate fund in a corporation's treasury from which election-related expenditures are made. This would ensure that corporate contributions are on the same footing, and are given the same public daylight, as contributions from individuals, political action committees, and political parties. *See generally*, § 13-37-225, MCA; Admin. R. M. 44.10.321 – 44.10.333.

¶59 The value of disclosure in preventing corruption cannot be understated. "[B]y revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention." *Human Life of Wash., Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010). "[P]rompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters." *Citizens United*, 130

34

S. Ct. at 916. The Ninth Circuit has recognized the importance of Montana's interest in disclosure in the context of ballot issue campaigns. *Canyon Ferry Rd. Baptist Church of East Helena v. Unsworth*, 556 F.3d 1021, 1032 (2009) (citing cases and noting disclosure requirements "may prevent 'the wolf from masquerading in sheep's clothing.'"). Regardless of the ultimate fate of Montana's ban on corporate political expenditures, state disclosure requirements should be applied to all expenditures by corporate entities "in connection with a candidate or a political committee that supports or opposes a candidate or a political party." Section 13-35-227(1), MCA.

¶60 In conclusion, I believe it is our unflagging obligation, in keeping with the courts' duty to safeguard the rule of law, to honor the decisions of our nation's highest Court. "Americans today accept the [United States Supreme] Court's role as guardian of the law. They understand the value to the nation of following Court decisions, . . . even when they disagree with a Court decision and even when they may be right and the decisions may be wrong." Stephen Breyer, *Making Our Democracy Work: A Judge's View* 214 (Alfred A. Knopf 2010). *Citizens United* makes clear that a state's outright ban on corporate political expenditures violates the First Amendment. Since § 13-35-227(1), MCA, imposes just such a ban, I respectfully dissent from the Court's decision to uphold the statute in its entirety. I would instead uphold only those provisions necessary to ensure independent corporate expenditures properly are reported and full disclosure is made to inform citizens and shareholders of the corporation's election-related spending.


/S/ BETH BAKER

35

Justice James C. Nelson, dissenting.

¶61 I respectfully dissent from the Court's decision.

## I. INTRODUCTION

¶62 The Supreme Court[1] could not have been more clear in *Citizens United v. Federal Election Commission*, ___ U.S.___, 130 S. Ct. 876 (2010): corporations have broad rights under the First Amendment to the United States Constitution to engage in political speech, and corporations cannot be prohibited from using general treasury funds for this purpose based on antidistortion, anticorruption, or shareholder-protection interests. The language of the *Citizens United* majority opinion is remarkably sweeping and leaves virtually no conceivable basis for muzzling or otherwise restricting corporate political speech in the form of independent expenditures.[2]

¶63 As a result, the critical question presented in the case now before us is simply this: Has the State of Montana identified a compelling state interest, not already rejected by the Supreme Court, that would justify the outright ban on corporate expenditures for political speech effected by § 13-35-227(1), MCA? Having considered the matter, I believe the Montana Attorney General has identified some very compelling reasons for limiting corporate expenditures in Montana's political process. The problem, however, is that regardless of how persuasive I may think the Attorney General's justifications are, the Supreme Court has already rebuffed each and every one of them. Accordingly, as much as I would like to rule in favor of the State, I cannot in good faith do so.

---

[1] I refer to the United States Supreme Court as "the Supreme Court." References to the Montana Supreme Court include "the Court," "this Court," "we," and "our."

[2] As the Court notes, direct contributions are not at issue here. Opinion, ¶ 8.

¶64 The Court, on the other hand, views the matter differently. The Court concludes that Montana may bar corporations from using general treasury funds for political speech—*Citizens United* notwithstanding—because "Montana has unique and compelling interests to protect." Opinion, ¶ 37. What "unique" interests render Montana exempt from *Citizens United*? One searches the Court's Opinion in vain to find any. The Court states that Montana has "a clear interest in preserving the integrity of its electoral process" and "an interest in encouraging the full participation of the Montana electorate." Opinion, ¶ 38. Yet, Montana is hardly unique in this regard. Every state in the Union is interested in preserving the integrity of its electoral process and in encouraging the full participation of its electorate. The Court asserts that Montana has interests in "protecting and preserving its system of elected judges," "preserving the appearance of judicial propriety and independence so as to maintain the public's trust and confidence," and "protecting the due process rights of litigants." Opinion, ¶¶ 39, 40, 45. But surely every state with an elected judiciary has these same interests. The Court also cites "the compelling interest of the people of Montana in strong voter participation in the process." Opinion, ¶ 41. Again, however, the people of Montana are certainly not the only people in the United States with a compelling interest in strong voter participation.

¶65 The fact is that none of the interests identified by the Court are unique to Montana. What the Court is really saying is that Montana has a unique history and unique qualities which make Montana uniquely susceptible to the corrupting influence of unlimited corporate expenditures. Indeed, the Court points to Montana's history involving the Copper Kings—their bribery of public officials, their manipulation of state government,

37

and their control over local judges in the late 1800s and early 1900s. Opinion, ¶¶ 22-28. Based on this history, the Court concludes that Montana voters "had a compelling interest to enact the challenged statute in 1912." Opinion, ¶ 36. Furthermore, the Court concludes that the dangers of corporate influence and domination still exist in Montana. Opinion, ¶¶ 29-31. In fact, the Court asserts that Montana is "especially vulnerable to continued efforts of corporate control to the detriment of democracy and the republican form of government." Opinion, ¶ 37. According to the Court, this is owing to Montana's sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs. Opinion, ¶ 37. Given these characteristics, the Court opines that unlimited corporate money would "irrevocably change the dynamic of local Montana political office races, which have historically been characterized by the low-dollar, broad-based campaigns run by Montana candidates." Opinion, ¶ 38. Moreover, the infusion of unlimited corporate money in support of or opposition to a targeted candidate would "minimize[ ] the impact of individual citizens" in the political process and leave the average citizen "effectively shut out of the process." Opinion, ¶¶ 38, 41. Accordingly, the Court holds that Montana may flat-out prohibit direct political spending by corporations.

¶66   Respectfully, I cannot agree that this "Montana is unique" rationale is consistent with *Citizens United*. And I seriously doubt this rationale is going to prevail in the Supreme Court when this case is appealed, as it almost certainly will be. For one thing, a fair reading of the *Citizens United* majority opinion, coupled with a fair reading of the separate concurring and dissenting opinions, leads inescapably to the conclusion that

38

every one of the Attorney General's arguments—and this Court's rationales adopting those arguments—was argued, considered, and then flatly rejected by the Supreme Court. Moreover, even accepting the propositions that Montana experienced an egregious period of corporate domination and political corruption at the turn of the 20th century, that Montana citizens understandably became fed up with the heavy-handed influence and corrupt practices of special interests at the time, and that Montana to this day remains especially vulnerable to continued efforts of corporate control, what the Court and the Attorney General have failed to recognize is this fundamental point: a ban on corporate speech is not a constitutionally permissible remedy for these problems. This should be abundantly clear from the following passage in *Citizens United*:

> If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by [the legislative branch] to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is our law and our tradition that *more speech, not less*, is the governing rule. *An outright ban on corporate political speech during the critical preelection period is not a permissible remedy*.

130 S. Ct. at 911 (emphases added).

¶67    The federal law struck down in *Citizens United* (2 U.S.C. § 441b, *as amended by* § 203 of the Bipartisan Campaign Reform Act of 2002) prohibited corporations from expressly advocating the election or defeat of candidates and from broadcasting electioneering communications within 30 days of a primary election and 60 days of a general election. *Citizens United*, 130 S. Ct. at 887, 897. The Montana law at issue here is even more categorical, prohibiting corporations from *ever* using general treasury funds

39

for political advocacy. Section 13-35-227(1), MCA ("A corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party."). If the federal law is facially unconstitutional, as the Supreme Court held, then I cannot envision any possibility that the Montana law will survive the predictable appeal of this Court's decision.

¶68 Unquestionably, Montana has its own unique history. No doubt Montana also has compelling interests in preserving the integrity of its electoral process and in encouraging the full participation of its electorate. And Montana may indeed be more vulnerable than other states to corporate domination of the political process. But the notion argued by the Attorney General and adopted by the Court—that these characteristics entitle Montana to a special "no peeing" zone in the First Amendment swimming pool—is simply untenable under *Citizens United*.

¶69 Admittedly, I have never had to write a more frustrating dissent. I agree, at least in principle, with much of the Court's discussion and with the arguments of the Attorney General. More to the point, I thoroughly disagree with the Supreme Court's decision in *Citizens United*. I agree, rather, with the eloquent and, in my view, better-reasoned dissent of Justice Stevens. As a result, I find myself in the distasteful position of having to defend the applicability of a controlling precedent with which I profoundly disagree.[3]

¶70 That said, this case is ultimately not about my agreement or disagreement with the Attorney General or our satisfaction or dissatisfaction with the *Citizens United* decision.

---

[3] The task is all the more distasteful in light of Western Tradition Partnership's questionable tactics and blatant hypocrisy. *See* Opinion, ¶¶ 7, 9, 19; Br. of Appellants 10-11, 22-23 (Apr. 15, 2011).

40

Whether we agree with the Supreme Court's interpretation of the First Amendment is irrelevant. In accordance with our federal system of government, our obligations here are to acknowledge that the Supreme Court's interpretation of the United States Constitution is, for better or for worse, binding on this Court and on the officers of this state, and to apply the law faithful to the Supreme Court's ruling.

¶71 Granted, there are some in the legislative and executive branches of government who would call—and, in fact, have called—for Montana to thumb its nose at the federal government, to disregard federal law, and to boldly ignore the Supremacy Clause (U.S. Const., art. VI, cl. 2). *See e.g.* Mike Dennison, *Bills Test State's Power to Nullify Fed Laws*, Helena Independent Record (Feb. 13, 2011). Regardless of those views, however, all elected officials in Montana—legislative, executive, and judicial—are sworn to "support, protect and defend the constitution of the United States." Mont. Const. art. III, § 3. Obviously, this means in accordance with the Supreme Court's interpretations of the United States Constitution. Thus, when the highest court in the country has spoken clearly on a matter of federal constitutional law, as it did in *Citizens United*, the highest court in Montana—this Court—is not at liberty to disregard or parse that decision in order to uphold a state law that, while politically popular, is clearly at odds with the Supreme Court's decision. This is the rule of law and is part and parcel of every judge's and justice's oath of office to "support, protect and defend the constitution of the United States." In my view, this Court's decision today fails to do so.

¶72 The Supreme Court has emphatically rejected the notion that corporate political speech may be restricted based on interests in protecting against political and campaign

41

corruption, safeguarding the ability of individual citizens to compete and participate in the political process, and preserving judicial integrity and impartiality. It makes no sense whatsoever that a state may rely on these very same interests—despite their rejection by the Supreme Court—as grounds for muzzling corporate speech simply because the state's history, demographics, economics, and elections are in some way "unique." It also makes no sense that, on one hand, the First Amendment protects corporate expenditures for political speech at the federal level and, apparently, throughout the rest of the country[4] but that, on the other hand, this First Amendment protection magically evaporates at Montana's borders because of a law adopted 100 years ago to address a very fact-specific situation. *See* Larry Howell, *Once Upon a Time in the West:* Citizens United*, Caperton, and the War of the Copper Kings*, at 6-16 (under the heading "The Montana Situation") (available at http://mtlr.org). Indeed, if the Supreme Court countenances this Court's approach of restricting corporate political speech rights based on population density, the existence of "mineral wealth," a history of "low-dollar, broad-based campaigns," and past experience with "heavy-handed influence" asserted by corporations, then there shortly will be nothing left of *Citizens United* at the state level. Due to its unpopularity, the Supreme Court's decision will be "state-lawed" into oblivion. While this would be a

---

[4] *See* Robert Barnes, *Citizens United Decision Reverberates in Courts across Country*, Washington Post (May 22, 2011) ("The [Supreme Court's] January 2010 decision freeing corporations and unions to spend whatever they like for and against candidates wiped out laws in 24 states banning such spending. Only Montana still wages a lonely court battle to maintain the ban."); Natl. Conf. of State Legislatures, *Citizens United and the States*, http://www.ncsl.org/default.aspx?tabid=19607 (updated Jan. 4, 2011) (noting that "[i]n 17 of the 24 states with laws affected by the *Citizens United* decision, legislation has been introduced to amend the law," and listing the bills).

good thing in the view of many, my point here is that the Supreme Court clearly did not intend, with the broad, sweeping, and unqualified language it used, to allow the holding of *Citizens United* to be circumvented through "uniqueness" stratagems.

¶73 Therefore, and with all due respect to my colleagues, I believe this Court is simply wrong in its refusal to affirm the District Court. Like it or not, *Citizens United* is the law of the land as regards corporate political speech. There is no "Montana exception." The proof of the Court's error is found in a comparison of the rationales provided in the Court's Opinion with the statements by the Supreme Court rejecting those rationales. I begin with an analysis of the *Citizens United* decision.

## II. *CITIZENS UNITED*

¶74 A significant portion of the *Citizens United* decision is devoted to the threshold question whether the Supreme Court should even be deciding the constitutional matters that it ultimately does decide. Indeed, the five Justices in the majority—Justice Kennedy joined by Chief Justice Roberts, Justice Scalia, Justice Thomas, and Justice Alito—consumed numerous pages attempting to explain why they were (1) addressing a claim that Citizens United had expressly dismissed in the district court (its facial challenge to the law's constitutionality), (2) deciding the case on grounds that arguably were broader than necessary to resolve Citizens United's claim, and (3) overruling prior precedents notwithstanding the doctrine of stare decisis. *See Citizens United*, 130 S. Ct. at 888-96, 911-13 (majority opinion); 130 S. Ct. at 917-25 (Roberts, C.J., & Alito, J., concurring). With regard to these issues, the dissent—Justice Stevens joined by Justice Ginsburg, Justice Breyer, and Justice Sotomayor—accused the majority of simply being "unhappy

43

with the limited nature of the case before us," of having "disdain" for the prior precedents, and thus of "chang[ing] the case to give themselves an opportunity to change the law."[5]  *Citizens United*, 130 S. Ct. at 932, 938.  The dissent also criticized the majority's determination to invalidate the statute on facial grounds, not only because this approach is " 'contrary to the fundamental principle of judicial restraint' " and has the secondary effect of "implicitly striking down a great many state laws as well," but also because the record before the Supreme Court was "nonexistent."  *Citizens United*, 130 S. Ct. at 932-33.  Whereas Congress had crafted the Bipartisan Campaign Reform Act of 2002 (BCRA) "in response to a virtual mountain of research on the corruption that previous legislation had failed to avert," the majority "now negates Congress' efforts without a shred of evidence on how § 203 or its state-law counterparts have been affecting any entity other than Citizens United."  *Citizens United*, 130 S. Ct. at 933.  The dissent argued that "it is the height of recklessness to dismiss Congress' years of bipartisan deliberation and its reasoned judgment on this basis, without first confirming that the statute in question was intended to be, or will function as, a restraint on electoral competition."  *Citizens United*, 130 S. Ct. at 969.  Finally, the dissent argued that the case could have been decided on various narrower grounds, *Citizens United*, 130 S. Ct. at 936-38, and that the majority had failed to give proper deference to the doctrine of stare decisis, 130 S. Ct. at 938-42.  On this latter point, the dissent observed that

---

[5] Unfortunately, remaking cases is not a phenomenon exclusive to the Supreme Court.  *See e.g. Western Sec. Bank and Glacier Bancorp, Inc. v. Eide Bailly LLP*, 2010 MT 291, ¶¶ 71-82, 359 Mont. 34, 249 P.3d 35 (Nelson, J., concurring in part and dissenting in part); *PacifiCorp v. State*, 2011 MT 93, ¶¶ 65-67, 360 Mont. 259, 253 P.3d 847 (Rice & Nelson, JJ., concurring).

*[s]tare decisis* protects not only personal rights involving property or contract but also the ability of the elected branches to shape their laws in an effective and coherent fashion. Today's decision takes away a power that we have long permitted these branches to exercise. State legislatures have relied on their authority to regulate corporate electioneering, confirmed in [*Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 110 S. Ct. 1391 (1990)], for more than a century. The Federal Congress has relied on this authority for a comparable stretch of time, and it specifically relied on *Austin* throughout the years it spent developing and debating BCRA. The total record it compiled was *100,000 pages* long. Pulling out the rug beneath Congress after affirming the constitutionality of § 203 six years ago shows great disrespect for a coequal branch.

*Citizens United*, 130 S. Ct. at 940 (emphasis in original, footnotes omitted).[6]

¶75 While I believe the *Citizens United* dissent makes a persuasive argument that the majority need not and should not have rendered such a broad constitutional holding, the fact remains that the majority did so, striking down the federal law as facially invalid. Thus, my focus hereafter is on what the majority specifically held regarding corporate independent expenditures on political speech. I approach this in step-by-step fashion.

**A. The First Amendment Applies to Political Speech by Corporations**

¶76 The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." This protection extends to corporations and to the context of political speech. *Citizens United*, 130 S. Ct. at 899, 900. Political speech does not lose

---

[6] In addition to the foregoing criticisms by the dissent, I note that the *Citizens United* majority's approach has also been criticized for flouting the very rhetoric that conservatives have espoused for decades against so-called "judicial activism." *See e.g.* Erwin Chemerinsky, Op., *Conservatives Embrace Judicial Activism in Campaign Finance Ruling*, L.A. Times (Jan. 22, 2010); *see also* Reza Dibadj, Citizens United *as Corporate Law Narrative*, 16 Nexus 39, 40-48 (2010-2011) (noting "technical concerns" and "constitutional problems" with the majority's approach); J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253 (2009) (criticizing the same five-Justice majority for not adhering to a conservative judicial methodology in *Dist. of Columbia v. Heller*, 554 U.S. 570, 128 S. Ct. 2783 (2008)).

First Amendment protection simply because its source is a corporation. *Citizens United*, 130 S. Ct. at 900. The identity of the speaker is not decisive in determining whether speech is protected; corporations and other associations, like individuals, contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster. *Citizens United*, 130 S. Ct. at 900. The Supreme Court "has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not 'natural persons.' " *Citizens United*, 130 S. Ct. at 900.

**B. Section 441b Burdens Corporate Political Speech**

¶77 The law at issue (2 U.S.C. § 441b, *as amended by* § 203 of the BCRA) prohibits corporations and unions from using general treasury funds to make independent expenditures that expressly advocate the election or defeat of candidates. It also prohibits the broadcast of electioneering communications within 30 days of a primary election and 60 days of a general election. *Citizens United*, 130 S. Ct. at 887, 897. This prohibition on corporate independent expenditures is a ban on speech. *Citizens United*, 130 S. Ct. at 898. It is true that corporations and unions may establish a "separate segregated fund" (known as a political action committee or PAC) for purposes of express advocacy or electioneering communications. The moneys received by the PAC are limited to donations from stockholders and employees of the corporation or, in the case of unions, members of the union. *Citizens United*, 130 S. Ct. at 887-88. Nevertheless, § 441b "is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak." *Citizens United*, 130 S. Ct. at 897. This is because "[a] PAC is a separate

46

association from the corporation. So the PAC exemption from § 441b's expenditure ban does not allow corporations to speak." *Citizens United*, 130 S. Ct. at 897 (citation omitted). Furthermore, "[e]ven if a PAC could somehow allow a corporation to speak— and it does not—the option to form PACs does not alleviate the First Amendment problems with § 441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations." *Citizens United*, 130 S. Ct. at 897.

## C. Standard of Review: Strict Scrutiny

¶78 "While it might be maintained that political speech simply cannot be banned or restricted as a categorical matter," the following standard "provides a sufficient framework for protecting the relevant First Amendment interests in this case." *Citizens United*, 130 S. Ct. at 898. Laws that burden political speech are subject to strict scrutiny, which requires the government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. *Citizens United*, 130 S. Ct. at 898.

## D. The Governmental-Function Interest

¶79 The First Amendment prohibits restrictions that distinguish among different speakers, allowing speech by some but not others. *Citizens United*, 130 S. Ct. at 898. Hence, the government "may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United*, 130 S. Ct. at 899. The Supreme Court has upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, but these rulings were based on "the proposition that there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech"—e.g., the function of public school education, the penological objectives of

the corrections system, and the capacity of the government to discharge its military responsibilities. *Citizens United*, 130 S. Ct. at 899. This interest is not applicable here because the corporate independent expenditures at issue would not interfere with governmental functions. Quite the contrary, "it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United*, 130 S. Ct. at 899.

### E.  The Antidistortion Interest

¶80    The Supreme Court in *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 110 S. Ct. 1391 (1990), found a compelling governmental interest in preventing " 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.' " *Citizens United*, 130 S. Ct. at 903 (quoting *Austin*, 494 U.S. at 660, 110 S. Ct. at 1397). The concerns in this regard are that corporations can "use resources amassed in the economic marketplace to obtain an unfair advantage in the political marketplace," and that corporate wealth can "dominat[e] . . . the political process" and "unfairly influence elections" when it is deployed in the form of independent expenditures. *Austin*, 494 U.S. at 659, 660, 110 S. Ct. at 1397, 1398 (internal quotation marks omitted).

¶81    The problem with this "antidistortion rationale," however, is that it is inconsistent with the First Amendment. *Citizens United*, 130 S. Ct. at 904-08. For one thing, " 'the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.' "

48

*Citizens United*, 130 S. Ct. at 904 (alteration omitted) (quoting *Buckley v. Valeo*, 424 U.S. 1, 48-49, 96 S. Ct. 612, 649 (1976) (per curiam)).

> *Buckley* rejected the premise that the Government has an interest "in equalizing the relative ability of individuals and groups to influence the outcome of elections." *Buckley* was specific in stating that "the skyrocketing cost of political campaigns" could not sustain the governmental prohibition. The First Amendment's protections do not depend on the speaker's "financial ability to engage in public discussion."

*Citizens United*, 130 S. Ct. at 904 (citations omitted).

¶82 Additionally, the antidistortion rationale interferes with the "open marketplace" of ideas protected by the First Amendment by permitting the government to ban the political speech of millions of associations of citizens. *Citizens United*, 130 S. Ct. at 906-07. Most of these are small corporations without large amounts of wealth—a fact which belies the argument that the statute at issue is justified on the ground that it prevents the "distorting effects of immense aggregations of wealth." *Citizens United*, 130 S. Ct. at 907. In any event, political speech is indispensable to decision-making in a democracy, and this is no less true because the speech comes from a corporation rather than an individual. *Citizens United*, 130 S. Ct. at 904. "Corporations, like individuals, do not have monolithic views. On certain topics corporations may possess valuable expertise, leaving them the best equipped to point out errors or fallacies in speech of all sorts, including the speech of candidates and elected officials." *Citizens United*, 130 S. Ct. at 912. By suppressing the speech of manifold corporations, both for-profit and nonprofit, the government prevents their voices and viewpoints from reaching the public and advising voters on which persons or entities are hostile to their interests. *Citizens United*,

49

130 S. Ct. at 907. In so doing, the government muffles the voices that best represent the most significant segments of the economy and deprives the electorate of information, knowledge, and opinion vital to its function. *Citizens United*, 130 S. Ct. at 907. When the government seeks to use its power "to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Citizens United*, 130 S. Ct. at 908.

### F. The Anticorruption Interest

¶83 The Government argues that corporate political speech may be banned in order to prevent corruption or its appearance. The *Buckley* Court found this interest sufficiently important to allow limits on *contributions*. *Citizens United*, 130 S. Ct. at 908 (citing *Buckley*, 424 U.S. at 25, 96 S. Ct. at 638). But when the *Buckley* Court examined a ban on *independent expenditures*, it found "that the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify [the ban]." *Buckley*, 424 U.S. at 45, 96 S. Ct. at 647. For the reasons which follow, that holding is reaffirmed here. *Citizens United*, 130 S. Ct. at 908-11.

¶84 " 'The hallmark of corruption is the financial *quid pro quo*: dollars for political favors.' " *Citizens United*, 130 S. Ct. at 910 (quoting *Fed. Election Commn. v. Natl. Conservative Political Action Comm.*, 470 U.S. 480, 497, 105 S. Ct. 1459, 1468 (1985)). "[C]ontribution limits, . . . unlike limits on independent expenditures, have been an accepted means to prevent *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909. Not only can large direct contributions be given to secure a political *quid pro quo*, the

scope of such pernicious practices can never be reliably ascertained. *Citizens United*, 130 S. Ct. at 908 (citing *Buckley*, 424 U.S. at 26-27, 96 S. Ct. at 638). Thus, limits on direct contributions are permissible to ensure against the reality or appearance of *quid pro quo* corruption. *Citizens United*, 130 S. Ct. at 908.

¶85 Independent expenditures, in contrast, have a substantially diminished potential for abuse. *Citizens United*, 130 S. Ct. at 908. By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. *Citizens United*, 130 S. Ct. at 910. " 'The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate.' " *Citizens United*, 130 S. Ct. at 908 (quoting *Buckley*, 424 U.S. at 47, 96 S. Ct. at 648). Limits on independent expenditures, therefore, "have a chilling effect extending well beyond the Government's interest in preventing *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 908.

¶86 "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909. Two years later, the Supreme Court purported to leave open the possibility that corporate independent expenditures could be shown to cause corruption. *See First Natl. Bank of Boston v. Bellotti*, 435 U.S. 765, 788 n. 26, 98 S. Ct. 1407, 1422 n. 26 (1978). However, "we now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909.

¶87    The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt. *Citizens United*, 130 S. Ct. at 910.

> "Favoritism and influence are not . . . avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness."

*Citizens United*, 130 S. Ct. at 910 (ellipsis in original) (quoting *McConnell v. Fed. Election Commn.*, 540 U.S. 93, 297, 124 S. Ct. 619, 748 (2003) (Kennedy, J., Rehnquist, C.J., & Scalia, J., dissenting)). The appearance of influence or access, furthermore, will not cause the electorate to lose faith in our democracy. As noted, an independent expenditure is, by definition, political speech presented to the electorate that is not coordinated with a candidate. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse to take part in democratic governance because of additional political speech made by a corporation or any other speaker. *Citizens United*, 130 S. Ct. at 910.

¶88    In sum, the hallmark of corruption is the financial *quid pro quo*: dollars for political favors. *Citizens United*, 130 S. Ct. at 910. The government has a sufficiently important interest in preventing *quid pro quo* corruption or the appearance of it. *Citizens United*, 130 S. Ct. at 909. Indeed, a *quid pro quo* arrangement would be covered by bribery laws. *Citizens United*, 130 S. Ct. at 908. Independent expenditures, however,

52

"do not lead to, or create the appearance of, *quid pro quo* corruption. In fact, there is only scant evidence that independent expenditures even ingratiate. Ingratiation and access, in any event, are not corruption." *Citizens United*, 130 S. Ct. at 910 (citation omitted). Therefore, "independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909. Of course, if elected officials succumb to improper influences from independent expenditures, surrender their best judgment, and put expediency before principle, then surely there is cause for concern; but in attempting to dispel either the appearance or the reality of these influences, "[a]n outright ban on corporate political speech . . . is not a permissible remedy." *Citizens United*, 130 S. Ct. at 911.

### G. The Shareholder-Protection Interest

¶89 The Government argues that corporate independent expenditures can be limited in the interest of protecting dissenting shareholders from being compelled to fund corporate political speech with which they do not agree. The First Amendment, however, does not allow the government to restrict corporate speech based on a shareholder's disagreement with the political views of the corporation. *Citizens United*, 130 S. Ct. at 911. There is, furthermore, little evidence of abuse that cannot be corrected by shareholders through the procedures of corporate democracy. *Citizens United*, 130 S. Ct. at 911.

### H. Foreign Influence

¶90 "We need not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation's political process." *Citizens United*, 130 S. Ct. at 911.

53

## I. Conclusion

¶91    Based on the foregoing, the Supreme Court overruled its decision in *Austin*. "We return to the principle established in *Buckley* and *Bellotti* that the Government may not suppress political speech on the basis of the speaker's corporate identity. *No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.*" *Citizens United*, 130 S. Ct. at 913 (emphasis added). Accordingly, the Supreme Court held that BCRA § 203's restriction on electioneering communications and 2 U.S.C. § 441b's prohibition on the use of corporate treasury funds for express advocacy were both invalid. *Citizens United*, 130 S. Ct. at 913. The Supreme Court (with only Justice Thomas dissenting) then went on to uphold BCRA's disclaimer and disclosure provisions against an as-applied constitutional challenge. *Citizens United*, 130 S. Ct. at 913-16.

## III. THE PLAINTIFFS' CLAIMS

¶92    Before examining this Court's rationales upholding § 13-35-227(1), MCA,[7] it is necessary to dispel some misconceptions regarding the plaintiffs' claims.

¶93    First, the Court asserts that neither Gary Marbut, the founder of Montana Shooting Sports Association (MSSA), nor Kenneth Champion, the sole shareholder of Champion Painting, Inc., has demonstrated "any material way" in which Montana law has hindered or censored their political activity or speech. Opinion, ¶ 17. Of course, Marbut and Champion are not parties to this lawsuit, and their speech rights are not at issue here. Hence, whether Marbut and Champion, *as individuals*, have been hindered or censored in

---

[7] I occasionally refer to § 13-35-227, MCA, hereafter as "Section 227" or "§ 227."

their political activity or speech is totally irrelevant. The question is whether the speech rights of MSSA and Champion Painting, *as incorporated entities*, have been infringed.

¶94 Second, the Court asserts that MSSA has failed to demonstrate that its speech has been impaired by § 227 because Montana law places no restriction on MSSA to spend its members' dues on political advocacy. Opinion, ¶ 17. As support for this, the Court cites the affidavit of former Commissioner of Political Practices Dennis Unsworth. What Unsworth specifically says, however, is this: "[MSSA] has been and continues to be free to spend its member dues and donations from its treasury regardless of its corporate status, as long as it complies with the filing requirements described above *and meets the criteria for a voluntary association*." (Emphasis added.) The affidavit of Mary Baker, program supervisor in the Office of the Commissioner of Political Practices, likewise states that "there is nothing in Montana's campaign finance laws that would prohibit [MSSA] from registering itself as a committee and making independent expenditures from its corporate treasury, *if it meets our office's criteria for a voluntary association*."[8] (Emphasis added.) According to Unsworth's affidavit, those criteria are as follows:

> A voluntary association that incorporates can spend its members' dues and donations on campaign contributions and independent expenditures from its treasury, if it: (1) is formed for the express purpose

---

[8] An exemption for "voluntary associations" is not codified in the statute. Rather, it is the Commissioner's "policy" to except such associations from § 227(1). Prior to 2003, a narrow category of nonprofit corporations was statutorily permitted to make contributions to or expenditures in connection with ballot issues, notwithstanding the general prohibition on corporate contributions and expenditures. *See* § 13-35-227(1), (4), MCA (2001). But in light of *Mont. Chamber of Commerce v. Argenbright*, 226 F.3d 1049 (9th Cir. 2000), which held that corporations cannot be prohibited from making direct corporate expenditures in ballot initiative campaigns, the 2003 Legislature amended the statute accordingly. *See* Laws of Montana, 2003, ch. 59.

of promoting political ideas, and could not engage in business activities; (2) has no shareholders or other persons affiliated so as to have a claim on its assets or earnings; (3) is not established by a business corporation, and does not accept contributions from business corporations.

¶95 Contrary to the Court's implication, there has been no determination in this case that MSSA in fact meets the criteria of a "voluntary association." And one of the exhibits attached to Unsworth's affidavit indicates that MSSA does *not* satisfy the criteria. The exhibit is an "advisory opinion" issued by former Commissioner Linda Vaughey on September 25, 2003, in which she addresses whether the nonprofit corporation People for Responsible Government (PRG) may engage in political activities in connection with candidates for public office. Vaughey starts with the premise that § 227 "appears on its face to prohibit all corporations, including nonprofit corporations, from making contributions or expenditures in connection with candidates, other than through separate, segregated funds." Vaughey then observes that, based on *Fed. Election Commn. v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 263-64, 107 S. Ct. 616, 631 (1986), there is an exception for nonprofit corporations which meet the three criteria listed above. Vaughey finally determines that PRG does *not* meet the third criterion because

> [n]othing in the Articles of Incorporation, the Bylaws, or the other information you have provided confirms that PRG was not established by a business corporation or a labor organization. Moreover, *you have not provided any information establishing that PRG does not directly or indirectly accept donations or contributions of anything of value from business corporations or labor organizations*. [Emphasis added.]

Likewise here, there is no evidence in the record—not in Marbut's affidavit, in MSSA's Articles of Incorporation (attached to Marbut's affidavit), in Unsworth's affidavit, in Baker's affidavit, or in any other document—establishing that MSSA "does not directly

56

or indirectly accept donations or contributions of anything of value from business corporations or labor organizations." Hence, MSSA does *not* qualify as a "voluntary association" under the Commissioner's definition, and MSSA is *not* allowed to use its general treasury funds to make independent expenditures in connection with candidate elections. MSSA states in the First Amended Complaint that it wishes to "use its corporate funds to directly support or oppose candidates." In light of the foregoing discussion, § 227(1) bars MSSA from doing so. The Court is flat wrong, therefore, in stating that "the statute has no or minimal impact" on MSSA. Opinion, ¶ 46.

¶96 Third, the Court likewise misstates the impact on Champion Painting. For one thing, the Court again seems to be improperly focused on *Champion's* speech rights, which are not at issue, rather than *Champion Painting's* speech rights, which are at issue. Opinion, ¶ 18. The Court also suggests that the only reason Champion Painting is participating in this lawsuit is so that its shareholder (Champion) can be allowed to make "candidate endorsement[s]" using the company name. Opinion, ¶ 18. Finally, the Court asserts that because Champion, as sole shareholder, can simply establish a PAC to advocate for Champion Painting's interests and expend funds that he will decide to contribute, Opinion, ¶ 18, "the statute has no or minimal impact on . . . Champion," Opinion, ¶ 46. The Court is wrong on all counts.

¶97 According to the First Amended Complaint,

> Champion Painting intends to spend corporate funds to educate the citizens of Montana and Bozeman about political candidates and ballot issues that will either positively or negatively impact Montana's small businesses, and Champion Painting intends to publicly support or oppose candidates and issues relating to Montana's small businesses. The corporate funds will be

57

spent to purchase TV spots and radio advertisements, and to create and distribute brochures and fliers . . . .

Champion's affidavit is to the same effect: "In addition to being politically active as an individual, I would like for Champion Painting to be politically active. . . .  Since Champion Painting is a small business, its voice will be more effective than my voice when supporting or opposing candidates who may have an impact on small businesses." It is apparent, then, that Champion Painting's claim is about the corporation's ability to speak, not its shareholder's ability to speak.  And as the Court concedes, § 227(1) forbids the expenditure of Champion Painting's corporate funds to support or oppose candidates. Opinion, ¶ 18.  Nothing in § 227 exempts corporations held by a sole shareholder.  As for the Court's theory that Champion Painting could speak through a PAC, Opinion, ¶ 18, the Supreme Court rejected this approach as discussed above and noted again below.

## IV.  COMPARISON

¶98    I now turn to a comparison of the rationales provided in the Court's Opinion with the statements by the Supreme Court rejecting those rationales.  Again, the specific issue is the constitutionality of § 227(1)'s prohibition on corporate *expenditures* in connection with a candidate or a political committee that supports or opposes a candidate or a political party.  The disclosure laws, the prohibition on direct corporate contributions, and the Corrupt Practices Act as a whole have not been challenged.  Opinion, ¶¶ 2, 8.

### A.  The Political Committee Alternative

¶99    Section 227(1) states that "[a] corporation may not make a contribution or an expenditure in connection with a candidate or a political committee that supports or

58

opposes a candidate or a political party." Section 227(3), however, provides that "[t]his section does not prohibit the establishment or administration of a separate, segregated fund [known as a political committee or PAC] to be used for making political contributions or expenditures if the fund consists only of voluntary contributions solicited from an individual who is a shareholder, employee, or member of the corporation." *See* Opinion, ¶ 4.

¶100 The Court asserts that, in Montana, political committees are "easy to establish," "easy to use," and an "effective alternative to direct corporate spending for engaging in political speech." Opinion, ¶¶ 21, 47. The Supreme Court, however, stated: "A PAC is a separate association from the corporation. So the PAC exemption from [the law's] expenditure ban does not allow corporations to speak." *Citizens United*, 130 S. Ct. at 897 (citation omitted). Moreover, "[e]ven if a PAC could somehow allow a corporation to speak—*and it does not*—the option to form PACs does not alleviate the First Amendment problems." *Citizens United*, 130 S. Ct. at 897 (emphasis added).

¶101 The Court ignores the Supreme Court's holding that a PAC is "separate" from the corporation and, thus, is not a valid alternative to direct corporate expenditures. Indeed, the Court asserts that the Supreme Court rejected PACs "because of the burdensome, extensive, and expensive Federal regulations that applied." Opinion, ¶ 12. This is false. Granted, the Supreme Court briefly noted that "PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations." *Citizens United*, 130 S. Ct. at 897. Yet, even if federal PACs were as "easily implemented" as the Court says Montana's PACs are, Opinion, ¶ 21, the fundamental problem with PACs still remains:

59

"A PAC is a separate association from the corporation. So the PAC exemption from [the law's] expenditure ban does not allow corporations to speak." *Citizens United*, 130 S. Ct. at 897 (citation omitted). Bottom line: "[Section 227(1)] is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation [as permitted under § 227(3)] can still speak." *Citizens United*, 130 S. Ct. at 897. The Court's contrary holding is plainly wrong.

### B. Anticorruption and Restraining Corporate Influence

¶102 The Court cites various examples of "well-financed corruption" perpetrated by F. Augustus Heinze, the Anaconda Company, and W.A. Clark. Opinion, ¶¶ 23-28. Notably, some of these examples involved blatant bribery and *quid pro quo* corruption (i.e., dollars for political favors), but it is not clear that any of them involved independent expenditures (i.e., political speech presented to the electorate that is not coordinated with a candidate) in exchange for political favors. In any event, the Court then proceeds to paint a dismal picture of the corporate "domination" and "influence" that has persisted in Montana. Opinion, ¶ 29. From this discussion, the Court concludes as follows. First, voters had a "compelling interest" to enact the challenged statute in 1912 because "the real social and political power [in Montana] was wielded by powerful corporate managers to further their own business interests," and the voters were fed up with the "corrupt practices" and "heavy-handed influence" asserted by the special interests controlling Montana's political institutions. Opinion, ¶ 36. Second, the statute "has worked to preserve a degree of political and social autonomy" from "shadowy" corporate figures who seek to promote their own interests. Opinion, ¶ 37. And finally, there is still a

60

sufficient interest to support the statute because "[i]ssues of corporate influence, sparse population, dependence upon agriculture and extractive resource development, location as a transportation corridor, and low campaign costs make Montana especially vulnerable to continued efforts of corporate control." Opinion, ¶ 37.

¶103   It is patently unconstitutional, however, for the government to silence a speaker on the ground that the speaker might otherwise exert an undesired amount of "influence" or "control" in government and politics. Under such a rationale, any disfavored class of speakers could be censored if thought to be too "influential." The Supreme Court unequivocally repudiated the notion that corporate political speech can be restricted "as a means to prevent corporations from obtaining an unfair advantage in the political marketplace by using resources amassed in the economic marketplace." *Citizens United*, 130 S. Ct. at 904 (internal quotation marks omitted). *Austin*'s holding was founded on the same concern expressed by the Court here:  that "[c]orporate wealth can unfairly influence elections when it is deployed in the form of independent expenditures." *Austin*, 494 U.S. at 660, 110 S. Ct. at 1398. The Supreme Court in *Citizens United*, however, held that "*Austin* is overruled, so it provides no basis for allowing the Government to limit corporate independent expenditures." 130 S. Ct. at 913. The Supreme Court "rejected the premise that the Government has an interest in equalizing the relative ability of individuals and groups to influence the outcome of elections." *Citizens United*, 130 S. Ct. at 904 (internal quotation marks omitted).

¶104   "Favoritism and influence are not . . . avoidable in representative politics," and "[r]eliance on a generic favoritism or influence theory . . . is at odds with standard First

61

Amendment analyses because it is unbounded and susceptible to no limiting principle." *Citizens United*, 130 S. Ct. at 910 (ellipses in original, internal quotation marks omitted). More to the point, the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 130 S. Ct. at 898. " 'In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue.' " *Citizens United*, 130 S. Ct. at 902 (quoting *Bellotti*, 435 U.S. at 784-85, 98 S. Ct. at 1420). The government may not bar corporations from contributing to the "open marketplace" of ideas. *Citizens United*, 130 S. Ct. at 906. "When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Citizens United*, 130 S. Ct. at 908.

¶105 The Court tries to distinguish *Citizens United* as "decided upon its facts" and involving only federal laws and federal elections, while this case "concerns Montana law, Montana elections and . . . Montana history." Opinion, ¶¶ 11, 16. Yet, *Bellotti* involved a state law, and the Supreme Court in *Citizens United* expressly noted that

> [*Bellotti*] rested on the principle that the Government lacks the power to ban corporations from speaking. *Bellotti* did not address the constitutionality of the State's ban on corporate independent expenditures to support candidates. In our view, however, that restriction would have been unconstitutional under *Bellotti*'s central principle: *that the First Amendment does not allow political speech restrictions based on a speaker's corporate identity*.

*Citizens United*, 130 S. Ct. at 903 (emphasis added, paragraph break omitted).

¶106 Like its "influence" rationale, the Court's "corruption" rationale is also untenable. Regardless of the history of "bribery," "control," and "naked corporate manipulation" recounted by the Court, Opinion, ¶¶ 23, 25, 28, plaintiffs here do not challenge the statutory prohibition on corporate *contributions*. Rather, they challenge the prohibition on corporate *expenditures*. And the Supreme Court stated very clearly "that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909. "When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909. "The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Citizens United*, 130 S. Ct. at 910 (internal quotation marks omitted). "[I]ndependent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption. In fact, there is only scant evidence that independent expenditures even ingratiate. Ingratiation and access, in any event, are not corruption." *Citizens United*, 130 S. Ct. at 910 (citation omitted).

¶107 As for the Court's fear that invalidation of § 227(1)'s prohibition on independent expenditures by corporations will return Montana to its pre-1912 days of corruption and corporate domination, the Supreme Court answered this concern as follows:

> If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by [the legislature] to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and, it is our law and our

63

tradition that *more speech, not less*, is the governing rule. *An outright ban on corporate political speech . . . is not a permissible remedy.*

*Citizens United*, 130 S. Ct. at 911 (emphases added).

## C. Citizen Protection

¶108   The Court observes that allowing unlimited independent expenditures of corporate money into the Montana political process would "drastically change campaigning by shifting the emphasis to raising funds." Opinion, ¶ 30. Direct political spending by corporations could also "significantly affect the outcome of elections." Opinion, ¶ 32. The Court explains that Montana has a small population and enjoys political campaigns marked by person-to-person contact and a low cost of advertising compared to other states. Opinion, ¶ 30. Thus, the infusion of unlimited corporate money in support of or opposition to a targeted candidate would leave the average citizen candidate "unable to compete against the corporate-sponsored candidate." Opinion, ¶ 38.

¶109   Furthermore, Montana voters feel they do not really "count" in the political process unless they can make a material financial contribution; and they are concerned, therefore, that special interests hold sway. Opinion, ¶ 31. The percentage of campaign contributions from individual voters is much less in states that do not have restrictions on corporate spending. Opinion, ¶ 33. At present, the individual contribution limit for Montana House, Senate, and District Court races is $160 and for Supreme Court elections is $310. Opinion, ¶ 38. Thus, with the infusion of unlimited corporate money in support of or opposition to a targeted candidate, "Montana citizens, who for over 100 years have made their modest election contributions meaningfully count[,] would be effectively shut

64

out of the process." Opinion, ¶ 38. "Clearly the impact of unlimited corporate donations creates a dominating impact on the political process and inevitably minimizes the impact of individual citizens." Opinion, ¶ 41. The State "has an interest in encouraging the full participation of the Montana electorate." Opinion, ¶ 38; *accord* Opinion, ¶ 41.

¶110 While I understand the Court's desire to protect the ability of citizen candidates to compete, and the ability of citizens to meaningfully participate and be heard in the political process, this rationale has been rejected. " '[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment.' " *Citizens United*, 130 S. Ct. at 904 (brackets in original) (quoting *Buckley*, 424 U.S. at 48-49, 96 S. Ct. at 649). The Court's reasoning is essentially a repackaged version of the antidistortion rationale, which the Supreme Court answered as follows:

> *Austin* sought to defend the antidistortion rationale as a means to prevent corporations from obtaining "an unfair advantage in the political marketplace" by using "resources amassed in the economic marketplace." But *Buckley* rejected the premise that the Government has an interest "in equalizing the relative ability of individuals and groups to influence the outcome of elections." *Buckley* was specific in stating that the skyrocketing cost of political campaigns could not sustain the governmental prohibition. The First Amendment's protections do not depend on the speaker's financial ability to engage in public discussion.

*Citizens United*, 130 S. Ct. at 904 (citations and some internal quotation marks omitted). "The rule that political speech cannot be limited based on a speaker's wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker's identity." *Citizens United*, 130 S. Ct. at 905. The Court's citizen-protection theory is invalid under *Citizens United*.

65

## D. Elected Judges

¶111 The Court next discusses Montana's interests in "protecting and preserving its system of elected judges," providing "an independent, fair and impartial judiciary," and "preserving the appearance of judicial propriety and independence." Opinion, ¶¶ 39-40. The Court fears that "Montana judicial elections would be particularly vulnerable to large levels of independent spending, both in terms of fairness and in terms of the public perception of impartiality." Opinion, ¶ 44. The Court cites Sandra Day O'Connor's recent observation that the " 'crisis of confidence in the impartiality of the judiciary is real and growing.' "[9] Opinion, ¶ 45. Noting that Montana is not immune from the influence of corporate-funded "super spender groups," the Court concludes that Montana "has a compelling interest in precluding corporate expenditures on judicial elections based upon its interest in insuring judicial impartiality and integrity, its interest in preserving public confidence in the judiciary and its interest in protecting the due process rights of litigants." Opinion, ¶ 45.

¶112 While I share some of the Court's concerns,[10] I do not believe the Supreme Court will allow a state to single out corporations as a group and prohibit them from speaking in judicial elections. First of all, as noted already, the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not

---

[9] It is somewhat ironic that the Court would cite Justice O'Connor in the context of discussing Montana's "interest in protecting and preserving its system of elected judges," given that she has been openly critical of this form of selecting judges. *See Republican Party of Minn. v. White*, 536 U.S. 765, 788-92, 122 S. Ct. 2528, 2542-44 (2002) (O'Connor, J., concurring).

[10] *See* James C. Nelson, *Keeping Faith with the Vision: Interpreting a Constitution for This and Future Generations*, 71 Mont. L. Rev. 299, 311 (2010).

others." *Citizens United*, 130 S. Ct. at 898. More to the point, "the First Amendment does not allow political speech restrictions based on a speaker's corporate identity." *Citizens United*, 130 S. Ct. at 903.

¶113   Secondly, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 129 S. Ct. 2252 (2009), which the Court cites at ¶ 43, is of no assistance. *Caperton* held that a judge was required to recuse himself "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." 129 S. Ct. at 2263-64. As the Supreme Court later explained in *Citizens United*, "[t]he remedy of recusal was based on a litigant's due process right to a fair trial before an unbiased judge. *Caperton*'s holding was limited to the rule that the judge must be recused, not that the litigant's political speech could be banned." 130 S. Ct. at 910 (citation omitted). In other words, recusal is the remedy for the concern with "protecting the due process rights of litigants" (Opinion, ¶ 45), not banning corporate speech.

¶114   Third, Justice Stevens raised this exact issue in his dissent, pointing out that

> [t]he majority of the States select their judges through popular elections. At a time when concerns about the conduct of judicial elections have reached a fever pitch, the Court today unleashes the floodgates of corporate and union general treasury spending in these races. Perhaps "*Caperton* motions" will catch some of the worst abuses. This will be small comfort to those States that, after today, may no longer have the ability to place modest limits on corporate electioneering even if they believe such limits to be critical to maintaining the integrity of their judicial systems.

*Citizens United*, 130 S. Ct. at 968 (citations omitted). In response, the majority certainly could have left open the possibility that judicial elections implicate unique interests

67

justifying restrictions on corporate expenditures in that particular context. The majority did not do so, however.[11] The majority, rather, remained firm and categorical: the First Amendment does not allow political speech restrictions based on a speaker's corporate identity, and speech restrictions aimed at reducing the relative ability of corporations to influence the outcome of elections are invalid. *Citizens United*, 130 S. Ct. at 903, 904.

¶115 Lastly, the Supreme Court's decision in *White*, 536 U.S. 765, 122 S. Ct. 2528, strongly indicates that the interests cited by the Court here are insufficient for prohibiting corporate speech in judicial elections. The Supreme Court—Justice Scalia joined by Chief Justice Rehnquist, Justice O'Connor, Justice Kennedy, and Justice Thomas—held that the Minnesota Supreme Court's canon of judicial conduct (the "announce clause") prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violated the First Amendment. *White*, 536 U.S. at 788, 122 S. Ct. at 2542. The interests asserted in support of the announce clause were the same interests asserted by the Court in the present case:

> preserving the impartiality of the state judiciary and preserving the appearance of the impartiality of the state judiciary. Respondents reassert these two interests before us, arguing that the first is compelling because it protects the due process rights of litigants, and that the second is compelling because it preserves public confidence in the judiciary.

*White*, 536 U.S. at 775, 122 S. Ct. at 2535 (citation omitted). In analyzing these interests, the *White* Court considered different possible meanings of the term "impartiality." One meaning is the "lack of bias for or against either *party* to the proceeding," which

---

[11] Notably, the Supreme Court eight years earlier rejected as "not a true picture of the American system" the notion that an elected judiciary is completely separate from the enterprise of "representative government." *White*, 536 U.S. at 784, 122 S. Ct. at 2539.

"guarantees a party that the judge who hears his case will apply the law to him in the same way he applies it to any other party." *White*, 536 U.S. at 775-76, 122 S. Ct. at 2535 (emphasis in original). Without stating expressly whether this was a compelling state interest, the Supreme Court held that the announce clause's restriction on speech for or against particular *issues* did not serve the interest in assuring equal application of the law to particular *parties*. *White*, 536 U.S. at 776, 122 S. Ct. at 2535. Another meaning of impartiality is the "lack of preconception in favor of or against a particular *legal view*." *White*, 536 U.S. at 777, 122 S. Ct. at 2536 (emphasis in original). The Supreme Court disagreed, however, with the proposition that "[a] judge's lack of predisposition regarding the relevant legal issues in a case" is a compelling state interest. *White*, 536 U.S. at 777-78, 122 S. Ct. at 2536. Likewise, the Supreme Court concluded that a third possible meaning—"openmindedness"—was an implausible basis for the announce clause. *White*, 536 U.S. at 778-81, 122 S. Ct. at 2536-38.

¶116   Of relevance to the present discussion, the Supreme Court observed in *White* that "the notion that the special context of electioneering justifies an abridgment of the right to speak out on disputed issues sets our First Amendment jurisprudence on its head. Debate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges." 536 U.S. at 781, 122 S. Ct. at 2538 (alteration, emphasis, and internal quotation marks omitted). Concerning the relationship between judicial elections and the First Amendment, the Supreme Court stated:

> There is an obvious tension between the article of Minnesota's popularly approved Constitution which provides that judges shall be elected, and the Minnesota Supreme Court's announce clause which places

69

most subjects of interest to the voters off limits. . . . The disparity is perhaps unsurprising, since the ABA, which originated the announce clause, has long been an opponent of judicial elections. That opposition may be well taken (it certainly had the support of the Founders of the Federal Government), but the First Amendment does not permit it to achieve its goal by leaving the principle of elections in place while preventing candidates from discussing what the elections are about. *The greater power to dispense with elections altogether does not include the lesser power to conduct elections under conditions of state-imposed voter ignorance. If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles.*

*White*, 536 U.S. at 787-88, 122 S. Ct. at 2541 (second ellipsis in original, brackets, citations, and internal quotation marks omitted).

¶117  Justice O'Connor made a similar point in her concurrence:

Minnesota has chosen to select its judges through contested popular elections . . . .  In doing so the State has voluntarily taken on the risks to judicial bias described above.  As a result, the State's claim that it needs to significantly restrict judges' speech in order to protect judicial impartiality is particularly troubling.  If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.

*White*, 536 U.S. at 792, 122 S. Ct. at 2544 (O'Connor, J., concurring).

¶118  Perhaps most telling are the remarks of Justice Kennedy—who, as noted, authored the majority opinion in *Citizens United*.  Justice Kennedy agreed that "[j]udicial integrity is . . . a state interest of the highest order."  *White*, 536 U.S. at 793, 122 S. Ct. at 2544 (Kennedy, J., concurring).  He also acknowledged that a state may choose to have an elected judiciary, may strive to define those characteristics that exemplify judicial excellence, may enshrine its definitions in a code of judicial conduct, may adopt recusal

standards more rigorous than due process requires, and may censure judges who violate these standards. *White*, 536 U.S. at 794, 122 S. Ct. at 2545.

> *What [a state] may not do, however, is censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer.* Deciding the relevance of candidate speech is the right of the voters, not the State. The law in question here contradicts the principle that unabridged speech is the foundation of political freedom.
>
> The State of Minnesota no doubt was concerned, as many citizens and thoughtful commentators are concerned, that judicial campaigns in an age of frenetic fundraising and mass media may foster disrespect for the legal system. Indeed, from the beginning there have been those who believed that the rough-and-tumble of politics would bring our governmental institutions into ill repute. And some have sought to cure this tendency with governmental restrictions on political speech. See Sedition Act of 1798, ch. 74, 1 Stat. 596. Cooler heads have always recognized, however, that these measures abridge the freedom of speech—not because the state interest is insufficiently compelling, but simply because content-based restrictions on political speech are expressly and positively forbidden by the First Amendment. *The State cannot opt for an elected judiciary and then assert that its democracy, in order to work as desired, compels the abridgment of speech.*

*White*, 536 U.S. at 794-95, 122 S. Ct. at 2545 (emphases added, internal quotation marks and some citations omitted).

¶119 The principle espoused by Justice Kennedy in *White*—that a state may not "censor what the people hear as they undertake to decide for themselves which candidate is most likely to be an exemplary judicial officer"—is consistent with the theme of the *Citizens United* opinion: "[I]t is our law and our tradition that more speech, not less, is the governing rule," 130 S. Ct. at 911, and "[n]o sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations," 130 S. Ct. at 913. A fair reading of the broad holding in *Citizens United*, together with a fair reading of the First Amendment principles articulated in *White*, leads inevitably to the conclusion that

71

corporate independent expenditures can no more be prohibited in judicial elections than they can be in legislative and executive elections.

### E. Summary

¶120   In sum, what has happened here is essentially this:  The Supreme Court in *Citizens United* (and in *White*) rejected several asserted governmental interests; and this Court has now come along, retrieved those interests from the garbage can, dusted them off, slapped a "Made in Montana" sticker on them, and held them up as grounds for sustaining a patently unconstitutional state statute.   The erroneous premise underlying the Court's entire approach here is its belief that the Supreme Court rejected the asserted governmental interests only as applied to federal elections.  Opinion, ¶¶ 11, 16.  Nowhere in its decision did the Supreme Court state that there was something unique about federal elections that precluded the PAC-as-an-alternative theory, the antidistortion rationale, or the anticorruption interest as justifications for restricting independent expenditures by corporations.   The Supreme Court simply rejected all of these arguments outright, in broad and unqualified language.  Not only that, the Supreme Court expressly noted that "*Bellotti* did not address the constitutionality of the State's ban on corporate independent expenditures to support candidates.  *In our view, however, that restriction would have been unconstitutional under* Bellotti*'s central principle:  that the First Amendment does not allow political speech restrictions based on a speaker's corporate identity.*"  *Citizens United*, 130 S. Ct. at 903 (emphasis added) (citing *Bellotti*, 435 U.S. at 784-85, 98 S. Ct. at 1420).  This Court is extremely misguided, therefore, in attempting to resurrect the rejected governmental interests under a "Montana is unique" theory.

72

## V. CONCLUSION

¶121 As demonstrated, the Supreme Court's decision in *Citizens United* is clear with regard to the First Amendment's protection of corporate political speech. Section 13-35-227(1), MCA, impermissibly restricts such speech by prohibiting corporations from making "an expenditure in connection with a candidate or a political committee that supports or opposes a candidate or a political party." The statute is, therefore, facially unconstitutional under *Citizens United*.

¶122 That said, and as noted above, I agree, at least in principle, with the arguments and concerns expressed by the Attorney General and the amici curiae supporting the State. I am deeply frustrated, as are many Americans, with the reach of *Citizens United*. The First Amendment has now been elevated to a vaunted and isolated position so as to endow corporations with extravagant rights of political speech and, with those rights, the exaggerated power to influence voters and elections.

¶123 Professor Howell suggests that "[t]he disconnect between [*Citizens United*'s and *Caperton*'s] statements about corruption" provides Montana an opportunity to preserve its Corrupt Practices Act as applied to judicial elections. *See* Larry Howell, *Once Upon a Time in the West:* Citizens United*,* Caperton*, and the War of the Copper Kings*, at 26 (available at http://mtlr.org). For my own part, I doubt that approach will be successful. In its zeal to grant corporations unlimited rights of political speech, the Supreme Court summarily dismissed its decision in *Caperton* with the statement that *Caperton* "is not to the contrary" because its holding "was limited to the rule that the judge must be recused, *not that the litigant's political speech could be banned*." *Citizens United*, 130 S. Ct. at

910 (emphasis added). This statement, along with the observations of the dissent in *Citizens United* and the statements by the majority and concurring opinions in *White*, lead me to conclude that *Citizens United* will eventually be applied to state judicial elections,[12] leaving recusals as the sole remedy where corporate expenditures have corrupted or biased the judge or judges at issue.[13]

¶124 Once *Citizens United* is imposed on elected state judiciaries, I am concerned—as were Justices Stevens, Ginsburg, Breyer, and Sotomayor; as are my former colleagues (*see* Amicus Brief of Former Montana Supreme Court Justices William Hunt, William Leaphart, James Regnier, Terry Trieweiler and John Warner (Apr. 27, 2011)); and as is the Court in today's Opinion—that judicial elections will become little better than the corporate bidding wars that elections for partisan offices have already become. I have suggested, therefore, that Montana's voters may—and probably should—amend the Montana Constitution to implement a merit system for selecting judges. *See* James C. Nelson, *Introduction*, 72 Mont. L. Rev. 1, 5-6 (2011); *cf.* W. William Leaphart, *First Right of Recusal*, 72 Mont. L. Rev. 287 (2011) (suggesting that Montana adopt an enforceable mechanism for removing Montana justices when potential bias exists).

---

[12] As reflected in the discussion of *White* (¶¶ 116-118, *supra*), and as I have previously noted (Nelson, 71 Mont. L. Rev. at 310), the system of electing judges and justices presently finds little support or esteem from the appointed federal judiciary.

[13] Perhaps, ironically, it will come to pass that the best way to insure that a judge or justice does *not* sit on a case involving a particular corporation is for the corporation to run a vigorous and expensive campaign supporting the judge's election.

¶125 While, as a member of this Court, I am bound to follow *Citizens United*, I do not have to agree with the Supreme Court's decision.[14] And, to be absolutely clear, I do not agree with it. For starters, the notion that corporations are disadvantaged in the political realm is unbelievable. Indeed, it has astounded most Americans. The truth is that corporations wield inordinate power in Congress and in state legislatures. It is hard to tell where government ends and corporate America begins; the transition is seamless and overlapping. In my view, *Citizens United* has turned the First Amendment's "open marketplace" of ideas into an auction house for Friedmanian[15] corporatists. Freedom of speech is now synonymous with freedom to spend. Speech equals money; money equals democracy. This decidedly was not the view of the constitutional founders, who favored the preeminence of individual interests over those of big business. *Citizens United*, 130 S. Ct. at 949-50 (dissenting opinion).

¶126 Second, I disagree with the premise that unlimited corporate political speech is essential to "enlightened self-government" and aids the electorate in making "informed choices." *Citizens United*, 130 S. Ct. at 898, 907. I agree that "[r]hetoric ought not obscure reality." *Citizens United*, 130 S. Ct. at 907. But I cannot agree that the *Citizens*

---

[14] *Cf.* J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 255-56 (2009) ("It is the solemn duty of judges on the inferior federal courts to follow, both in letter and in spirit, rules and decisions with which we may not agree. Our oath demands it, and our respect for the Supreme Court as an institution and for the able and dedicated individuals who serve on it requires no less. But esteem can likewise be manifest in the respectful expression of difference—that too is the essence of the judicial craft.").

[15] Milton Friedman: the guru, popularizer, and propagandist for unrestrained free-market economics. *See* Naomi Klein, *Shock Doctrine: The Rise of Disaster Capitalism* (Henry Holt & Co. 2007).

*United* majority's views reflect "reality." For one thing, voters generally do not have the desire, much less the time, sophistication, or ability, to sift through hours upon hours of attack ads, political mumbo jumbo, and sound bites in order to winnow truth (of which there often seems to be very little) from fiction and half-truths (of which there unfortunately seems to be an endless supply).[16] The Supreme Court believes the solution for false or misleading speech is more speech. Yet, an endless barrage of accusations and counteraccusations providing more fodder than fact only serves to overwhelm, confuse, and disenchant voters.

¶127 Furthermore, it defies reality to suggest that millions of dollars in slick television and Internet ads—put out by entities whose purpose and expertise, in the first place, is to persuade people to buy what's being sold—carry the same weight as the fliers of citizen candidates and the letters to the editor of John and Mary Public. It is utter nonsense to think that ordinary citizens or candidates can spend enough to place their experience, wisdom, and views before the voters and keep pace with the virtually unlimited spending capability of corporations to place corporate views before the electorate. In spending ability, bigger really is better; and with campaign advertising and attack ads, quantity counts. In the end, candidates and the public will become mere bystanders in elections.

---

[16] For example, the *Los Angeles Times* recently reported that Crossroads GPS, the conservative group co-founded by Karl Rove, released an ad slamming Montana Senator Jon Tester for supporting an Environmental Protection Agency regulation on farm dust. However, one Montana cable show pulled the ad "because the network determined that it was false; the regulation was actually never proposed, and the vote cited in the ad was a procedural measure." Tom Hamburger & Melanie Mason, *Chamber of Commerce Getting Early Start with Attack Ads*, L.A. Times (Nov. 16, 2011).

¶128   Third, with respect to the interests of shareholders in not being compelled to fund corporate political speech with which they disagree, I do not believe that participation in "corporate democracy" actually accounts for anything—unless, of course, the objecting shareholder is an insider or owns a controlling percentage of the outstanding stock.  I cannot agree that "corporate democracy" will cause big business and multinational corporations to exercise responsibly their new unlimited power to speak and spend.  It won't, because money, influence, and access are at stake.  Any notion to the contrary is simply the triumph of hope over experience.

¶129   Fourth, I absolutely do not agree that corporate money in the form of "independent expenditures" expressly advocating the election or defeat of candidates cannot give rise to corruption or the appearance of corruption.  Of course it can.  Even the most cursory review of decades of partisan campaigns and elections, whether state or federal, demonstrates this.  *Citizens United* held that the only sufficiently important governmental interest in preventing corruption or the appearance of corruption is one that is limited to *quid pro quo* corruption.  This is simply smoke and mirrors.  *See Citizens United*, 130 S. Ct. at 961 (dissenting opinion).  In the real world of politics, the "*quid pro quo*" of both direct contributions to candidates and independent expenditures on their behalf is *loyalty*.  And, in practical effect, experience teaches that money corrupts, and enough of it corrupts absolutely.  *See e.g. Caperton*, 556 U.S. 868, 129 S. Ct. 2252.

¶130   Fifth, therefore, I cannot agree with the holding that the prevention of corruption in the form of independent expenditures is not a compelling state interest.  There is no plausible reason why a state would *not* want to protect the integrity of its election process

77

against corruption and undue influence; to do otherwise would render the fundamental right to vote a meaningless exercise. To my knowledge, the First Amendment has never been interpreted to be absolute and gloriously isolated from other fundamental rights and values protected by the Constitution. Yet, *Citizens United* distorts the right to speech beyond recognition. Indeed, I am shocked that the Supreme Court did not balance the right to speech with the government's compelling interest in preserving the fundamental right to vote in elections.

¶131 At the same time, though, I am not persuaded that Montana's experience with corruption is as "unique" as the Attorney General and this Court posit. Each state has its own corruption horror stories and has battled political and election corruption at one time or another. Even a casual examination of the daily newspaper or the evening news proves that battling political corruption is ongoing; like painting the Golden Gate Bridge, when you reach one end, you start over at the other. It should be noted that Montana's Corrupt Practices Act was adopted in 1912 at a time when the country's focus was on preventing political corruption, not on protecting corporate influence. Due to intervening changes in the composition and philosophy of the Supreme Court, that focus has now flip-flopped. *See* Zephyr Teachout, *The Historical Roots of* Citizens United v. FEC: *How Anarchists and Academics Accidentally Created Corporate Speech Rights*, 5 Harv. L. & Policy Rev. 163 (2011). Montana's Corrupt Practices Act has become an historical—and unconstitutional—artifact, and it will have to be legislatively revised to accommodate a changed time and a changed Supreme Court. A number of our sister

states have modified their laws in the wake of *Citizens United* (*see* ¶ 72 n. 4, *supra*), and I expect that Montana's 2013 Legislature will, or should, be tasked with doing the same.

¶132 Lastly, I am compelled to say something about corporate "personhood." While I recognize that this doctrine is firmly entrenched in the law, *see Bellotti*, 435 U.S. at 780 n. 15, 98 S. Ct. at 1418 n. 15; *but see* 435 U.S. at 822, 98 S. Ct. at 1439-40 (Rehnquist, J., dissenting), I find the entire concept offensive. Corporations are artificial creatures of law. As such, they should enjoy only those powers—not constitutional rights, but legislatively-conferred powers—that are concomitant with their legitimate function, that being limited-liability investment vehicles for business. Corporations are not persons. Human beings are persons, and it is an affront to the inviolable dignity of our species that courts have created a legal fiction which forces people—human beings—to share fundamental, natural rights with soulless creations of government. Worse still, while corporations and human beings share many of the same rights under the law, they clearly are not bound equally to the same codes of good conduct, decency, and morality, and they are not held equally accountable for their sins. Indeed, it is truly ironic that the death penalty and hell are reserved only to natural persons.

¶133 Having said all this, I must return to the central point of this Dissent. Regardless of my disagreement with the views of the *Citizens United* majority, the fact remains that the Supreme Court has spoken. It has interpreted the protections of the First Amendment vis-à-vis corporate political speech. Agree with its decision or not, Montana's judiciary and elected officers are bound to accept and enforce the Supreme Court's ruling—in the same way that this Court demands obedience to its rulings, like them or not.

¶134 For these reasons, I dissent from the Court's analysis in the instant case. I disagree with the Court's decision to parse *Citizens United* in a fashion so as to "send a message" to, or be the next "test case" before, the Supreme Court. In my view, this approach is disingenuous. Montana is in the same First Amendment swimming pool as every other state, and the Supreme Court has dictated that its waters are expansive and deep when it comes to corporate political speech. *Citizens United* is the law of the land, and this Court is duty-bound to follow it. When this case is appealed to the Supreme Court, as I expect it will be, a summary reversal on the merits (*see* U.S. Sup. Ct. R. 16) would not surprise me in the least.

¶135 In my opinion, District Court Judge Sherlock's well-reasoned and courageous—though politically unpopular—decision should be affirmed. I cannot agree with this Court's determination not to do so. Therefore, I respectfully and regretfully dissent.

/S/ JAMES C. NELSON